527 So.2d 309 (1988)
Glenda Schubert D'SPAIN
v.
James L. D'SPAIN.
No. 87-CA-629.
Court of Appeal of Louisiana, Fifth Circuit.
February 8, 1988.
On Rehearing June 7, 1988.
Writ Granted April 29, 1988.
*310 Lowe, Stein, Hoffman & Allweiss, Robert C. Lowe, Terence L. Hauver, David H. Bernstein, New Orleans, for plaintiff/appellee.
Gauthier, Murphy, Sherman, McCabe, Chehardy & Ellis, David R. Sherman, Richard J. Tomeny, Susan M. Chehardy, William C. Harrison, Jr., Metairie, for defendant/appellant.
Before KLIEBERT, GRISBAUM and GOTHARD, JJ.
GOTHARD, Judge.
Mr. James D'Spain appeals from a judgment partitioning the community property between him and his former wife, Mrs. Glenda Tanner. The appellant contends that the trial judge made several errors *311 which resulted in an inequitable distribution of the community assets and liabilities. Our review of the record reveals that the lower court's judgment is correct, and for the reasons given below, it is affirmed.
The law provides that when spouses are unable to agree upon a partition of community property, the court shall divide the community assets and liabilities so that each spouse receives property of an equal net value. LSA-R.S. 9:2801. The statute further provides:
(a) The court shall value the assets as of the time of trial on the merits, determine the liabilities, and adjudicate the claims of the parties.
. . . . .
(c) In allocating assets and liabilities, the court may divide a particular asset or liability equally or unequally or may allocate it in its entirety to one of the spouses....
In the event that the allocation of assets and liabilities results in an unequal net distribution, the court shall order the payment of an equalizing sum of money... upon such terms and conditions as the court shall direct....
The trial court is obligated to follow the dictates of R.S. 9:2801 in effecting the partition. On appeal, we may not disturb the trial court's judgment in the absence of manifest error. Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973); Jackson v. Hurst, 480 So.2d 487 (La.App. 5 Cir.1985).
James D'Spain and Glenda Tanner were married on May 31, 1975. Mrs. D'Spain's petition for separation was filed on November 2, 1984. Coupled with the separation was a prayer for a restraining order and injunction, restraining her husband from disposing of or encumbering any community property during the pendency of the suit. The restraining order was granted to take effect immediately. A legal separation followed on June 28, 1985. After lengthy litigation, the couple was divorced on April 1, 1987 and their community property finally partitioned in two judgments rendered July 6, 1987.

I.
Appellant's major objection to the partition concerns the trial court's evaluation of the D'Spain Enterprises-Coursey Boulevard Partnership, which appellant listed as a community asset on his sworn Descriptive List of the assets and liabilities in the former community.
The D'Spain Enterprises-Coursey Boulevard Partnership is a Louisiana general partnership. Its Articles of Partnership were duly registered with the Secretary of State on May 3, 1983. Its partners are appellant and one Kevin Lakins. Their proportionate ownership and capitalization interest was established by the Articles at 85 percent and 15 percent, respectively. Lakins is the managing general partner. The partnership was formed to own and develop a certain tract of land in Baton Rouge, Louisiana, denominated the Coursey Tract, which is the partnership's primary asset.
The Coursey tract consists of 54.19 acres[1] located in a very desirable section of South Baton Rouge. It is divided into five vacant, unimproved, but developed sites (i.e., with service from public utilities, police, and fire protection), zoned for heavy commercial and urban use, situated on the north and south sides of Coursey Boulevard with access to Airline Highway and Interstate 12. The trial court assigned this partnership asset a gross value of $13,095,000 with debts of $4,169,836 and a community interest of 85 percent. The trial court further discounted the asset by five percent or $654,750 in consideration of (then) current economic conditions, resulting in a $7,029,852 net value of the asset to the community which was allocated to appellant.
a. Community Interest
The appellant first complains that the trial judge should have determined the former community's interest in the partnership to be 75 percent, rather than 85 percent, *312 to conform with an Amendment to the original Articles of Partnership duly registered with the Secretary of State on August 19, 1985. This Amendment reads in pertinent part:
"... First Amendment to the Articles of Partnership of D'SPAIN ENTERPRISES-COURSEY BOULEVARD PARTNERSHIP.... Was filed and registered in this Office on August 19, 1985....
This Agreement effective as of the 27th day of November, 1984....
WHEREAS D'Spain and Lakins desire to amend the Articles to increase the Distributive Share of Lakins and to decrease the Distributive Share of D'Spain... and ... hereby amend the Articles of Partnership ... as follows.... D'Spain 75% Lakins 25% ..."
Appellant alleges that the reason for the Amendment dates back to the formation of the partnership in 1983 at which time he orally agreed to sell Lakins an additional 10 percent of his partnership interest. Lakins allegedly exercised his option on November 27, 1984 in an instrument entitled "Sale and Assignment of Partnership Interest."[2] However, the trial court refused to admit testimony regarding the alleged oral agreement without supporting written proof; said evidence was then made by proffer.
Appellant proffered testimony from Lakins which corroborated the alleged oral agreement, and testimony from two attorneys involved in drafting various partnership agreements. The first attorney to testify, Rudolph Ramelli, merely identified the Sale and Assignment of Partnership Interest as drafted by his law firm. The other attorney, Michael Castex, testified that he had drafted it on November 27, 1984 at the request of Kevin Lakins who was concerned over the D'Spains' marital situation. This attorney also testified that it was through his oral conversations with Lakins that he was familiar with the appellant's alleged previously existing oral agreement to transfer additional interest to Lakins.
In our view, the sale of an interest in a partnership which owns immovables should follow those requisites of form which apply to sales of immovable property. See, LSA-C.C. arts. 1832, 2801, 2802, 2806; Wolf v. Whitney, 424 So.2d 300 (La. App.Cir. 1 1983), writ denied, 428 So.2d 807. An option to purchase an immovable must be evidenced in writing. LSA-C.C. art. 2462; McMikle v. O'Neal, 207 So.2d 922 (La.App.Cir. 2 1968); Greenleaf Plantation, Inc. v. Kieffer, 403 So.2d 100 (La.App. 3 Cir.1981) writ denied, 409 So.2d 675 (La.). Nevertheless, parole evidence may be admitted in the interest of justice to prove a modification of a written act by a subsequent and valid oral agreement. LSA-C.C. art. 1848. In addition, an oral transfer of an immovable has effect between the parties thereto who recognize it, but it does not affect third parties until filed for recordation. LSA-C.C. 1839.
Here, while the profferred testimony could have been admitted to prove that an oral agreement modified the original Articles of Partnership, the trial court chose not to, finding it incredible. And, as regards the alleged sale of interest on November 27, 1984, the trial court found that an injunction was in effect at the time prohibiting said sale. Rabalais v. Hillary Builders, Inc. 62 So.2d 846 (La.App.Cir. 2 1953). The trial judge was quite frank in his disbelief of the appellant's evidence. He made the following Findings of Facts dated January 21, 1987:
The original partnership allotted 85% to James D'Spain and 15% to Kevin Lakins. Subsequent to the law suit filed by Mrs. D'Spain on November 2, 1984 and allegedly before service of the injunction on James D'Spain, D'Spain attempted to transfer an additional 10% interest in the Partnership to Lakins on November 27, 1984. This midnight, shadowy transaction is not supported by any believable evidence other than some after the fact acknowledgment on August 1, 1985 filed red to Lakins 10 percent of his partnership interest for the consideration of $209,545. *313 with the Secretary of State, August 19, 1985.
The Court finds this attempted partnership amendment of no legal effect insofar as Mrs. D'Spain's interest is concerned and awards her one half (½) of the original D'Spain community interest (85%) in this partnership asset. The validity of James D'Spain's alleged transfer to Lakins is for them or a Court to resolve, vis a vis.
From our review of the record we can find no sound reason for this court to disturb the trial court's disposition of this issue, even considering the appellant's proffered testimony. Jackson v. Hurst, supra. We accordingly hold, as did the trial court, that the First Amendment to the Articles of Partnership is ineffective to reduce the former community interest in this asset from 85 percent to 75 percent.
b. Counter Letter
Appellant next claims the trial court erred in finding that appellant and Lakins owned as individuals in a proportion of 85 percent and 15 percent respectively an undivided 45.87 percent of the Coursey tract. Appellant argues that the ruling is contrary to the real estate's taxing status and now clouds its title. Because we find, as did the trial court, that the resolution of this issue does not affect the former community's legal share in the asset, we discuss it only briefly.
The record establishes that title to the Coursey Tract was previously owned on the public records by Howard W. Kindig, Jr., but the actual owner, pursuant to a counter letter, was a partnership known as the Coursey Boulevard Investment Partnership (Old Coursey). Appellant and Lakins owned a 45.87 percent partnership interest in Old Coursey. As stated, appellant and Lakins withdrew from Old Coursey and formed D'Spain Enterprises-Coursey Boulevard Partnership to acquire the Coursey Tract from Old Coursey. In order to preclude a taxable transaction to appellant and Lakins, Old Coursey exchanged appellant's and Lakins' 45.87 percent partnership interest therein for an equivalent interest in the land held. Subsequently, on May 2, 1983 an Act of Sale with Assumption of Mortgage was executed between Howard W. Kindig, Jr., as agent for Old Coursey, and the D'Spain Enterprises-Coursey Boulevard Partnership, which transferred the remaining interest in the immovable property held by Old Coursey to the D'Spain Enterprises-Coursey Boulevard Partnership. The Closing Statement attached to the sale shows that the 45.87 percent interest already owned by appellant and Lakins was credited against the total sale price of the land.[3] Along with the sale, on that same day, a counter letter was executed.
Appellant states, that the purpose of the counter letter was to transfer the 45.87 percent of the Coursey Tract individually owned by appellant and Lakins to D'Spain Enterprises-Coursey Boulevard Partnership, but that through clerical error the counter letter as executed does not reflect the intended transaction. Consequently, in an attempt to show such a transfer was intended, appellant urges that the counter letter as written is ambiguous, so that parole evidence can be looked to for its true intent. Appellant points to paragraph one of the counter letter as ambiguous and argues that it sets up a transfer of 45.87 percent interest in the immovable but fails to designate a transferee. The parole evidence appellant submitted includes an alleged rough draft of the counter letter, which designates the transferee to be D'Spain Enterprises-Coursey Boulevard Partnership.
The appellee takes the position that the counter letter as a whole is not ambiguous, that it is quite evident from its other paragraphs that appellant and Lakins are the transferees of the 45.87 percent interest, and, therefore, that the counter letter is not susceptible to further interpretation by parole evidence. LSA-C.C. art. 2046.
*314 The trial court after a review of all documents submitted found that appellant and Lakins individually own 45.87 percent of the immovable property formerly owned by Old Coursey. Our review of the evidence shows no error in this ruling.
c. Value of Partnership
The appellant complains that the trial court should have set the value of the Coursey Tract at $8,500,000, rather than $12,440,250, to conform with the testimony of the appellant's appraiser.
In support of this complaint, appellant argues that the trial court initially erred in accepting the appellee's witness, Norbert Schexnayder, as expert in the field of commercial appraisal, and also in according less weight to his witness, Kenneth Kuebel, an expert in the same field.
Mr. Schexnayder was examined extensively as to his qualifications as an expert in his field. He has worked in this field for approximately 25 years and periodically takes courses and attends seminars related thereto. A trial court has great discretion in determining a witness's competence to testify as an expert. We find no abuse of discretion here, particularly since experience alone is sufficient to qualify a person as an expert. Aaron v. Bankers and Shippers, Ins. Co., 475 So.2d 379 (La. App.Cir. 1 1985).
As regards the weight given by the trial court to the testimony of each of the experts, the trier of fact is not bound by expert testimony; evidence of an expert witness is to be weighed by the trier of fact the same as any other evidence. Aaron, supra.
Upon reviewing the record and the written reasons for judgment, it is evident that the court considered the testimony of Schexnayder as well as that of Kuebel, and in the court's own words:
The largest asset remaining in the community is a tract of land in Baton Rouge denominated Coursey Boulevard Partnership. An evaluation of this tract was obtained by each party and the expert for each was impressive. The Court accepts the valuation placed upon the tract by Norbert Schexnayder, Jr. finding his appraisal based upon his superior knowledge of the locality as well as his more appropriate individual tract treatment.
Such a finding by the trial court is not clearly wrong.
As regards the actual value assigned by the trial court to the Coursey Tract, we observe that each expert applied a Market Data Approach to arrive at the property's current gross market value with Mr. Keubel further applying a development approach to obtain a net market value.
In the Market Data approach, each of the appraised sites is compared to sales of considered comparable sites that have taken place in the immediate market area in the recent past. Each site is considered for highest and best use of land, physical features, geographic, economic, and social factors which could have a bearing on the property's value. Using this method, and for the function of obtaining a valuation basis for community property settlement, Mr. Schexnayder appraised the property as if each of the five sites were sold separately within about eighteen months to arrive at a cumulative gross market estimated value of $13,095,000 which equates to an average gross market value of $5.86 per square foot as of December 18, 1985. Mr. Kuebel's appraisal differed in that he looked at the property as if the entire tract was sold to a single purchaser, but over a six year period.
Mr. Kuebel's estimate which included lot A-2 (subsequently sold) was gross $14,868, 709 as of October 1, 1985. After reducing this estimate to account for the sale of Lot A-2, Mr. Kuebel's estimated gross market value equated to $14,411,329 or $6.45 per square foot which we observe is a higher appraisal than that of Mr. Schexnayder's. However, Mr. Kuebel further applied a developmental analysis whereby he took into account the costs involved in selling the acreage by individual tracts, with an absorption time of six years. He then deducted these costs from the gross market estimate. In addition, he discounted the income *315 received from the sale to present value, resulting in a net market value of $8,500,000, or $3.75 per square foot.
As stated, the trial court accepted the appraisal of appellee's expert, Mr. Schexnayder, which the court further discounted by five percent due to the existing economic condition, to arrive at a current value of the asset at $12,440,250.
The issue to be determined here is whether the trial court should have used, as appellant urged, a net rather than a gross market value in the valuation of this asset.
Under the circumstances given, we think the trial court was correct in using a gross market value in arriving at the value of this asset to the former community. The record shows that the asset was bought by D'Spain Enterprises-Coursey Boulevard Partnership for development and investment purposes; accordingly, we do not believe that the appellant is entitled to the deductions and expenses it is claimed will be incurred with the holding of the property for a sell-out time of six years. Appellant has a number of options he may exercise under the partnership articles; he can choose to develop the land, sell it, or keep it for any length of time he chooses. While it is true that certain expenses will be incurred with this investment, both experts testified that the property is very desirable, in a prime commercial-business location of Baton Rouge with a rapid growth and expansion rate and increasing property values. In our view, this indicates that the property is a sound investment and likely to remain so. Therefore, we find the trial court's acceptance of Schexnayder's appraisal of the property, for purposes of community property division, equitable.[4]
Finally, appellant complains that the trial court incorrectly valued the former community's interest in the partnership on the Coursey Tract, rather than on the selling price of appellant's partnership interest.
In Martinez v. Posner, Martinez, and Padgett, 385 So.2d 525 (La.App. 3d Cir. 1980), writ denied, 393 So.2d 727 (La.), the third circuit was confronted with the fundamental question of the nature of a partner's interests in the assets of the partnership. Following a dissolution of her marriage to one of the partners who owned a one-third interest in the partnership, the plaintiff sought to be recognized as an owner of a one-sixth interest in the partnership. Citing general principles of partnership,[5] the court held that no one is a partner except by the consent of all other partners. Therefore the former wife of a partner, upon the dissolution of the community of acquets and gains, does not receive any interest in the partnership, but is entitled only to one-half of the value of the husband-partner's interest in the partnership assets.
In our opinion the holding of the Martinez case is determinative of the issue raised here. Accordingly, we hold that the trial court correctly found that Mrs. D'Spain is entitled to one-half of the value of her former husband's interest in the partnership's major asset (that is, the Coursey Tract), rather than on the selling price of his interest in the partnership.

II.
Appellant next objects to the trial court's treatment of a debt owed by the former community to one of its companies, the Gulf South Insurance Company (G.S.I.).
The Gulf South Insurance is a foreign corporation based in the Cayman Islands owned 80 percent by the former community and 20 percent by Lakins. The trial court found that its gross value to the former community is $800,000, and that the former community has a valid debt due to that entity of $500,000. Both the asset and the debt were allocated to appellant, resulting *316 in a net value to appellant of $300,000. Appellant argues that the debt owed is instead $1,050,000, which would net him a negative $250,000.
In support of his claim appellant presented the testimony of one Raymond Ceaser, controller of D'Spain Enterprises. Mr. Ceaser testified that D'Spain Enterprises borrowed from G.S.I. over a twelve month period a total sum of $1,000,000 (February 7, 1984$500,000 borrowed; March 19, 1984$200,000; January 3, 1985$300,000), which was paid off on January 15, 1985 with monies borrowed from D'Spain Enterprises-Coursey Boulevard Partnership. The partnership then borrowed $1,050,000 from G.S.I., on June, 12, 1985, which was reported to have been applied towards payment of the amount borrowed from the partnership. Appellant argues on the basis of this evidence that all monies borrowed went into the D'Spain Enterprises operating accounts to pay bills of the former community.
Appellee offered testimony from Brian Fabacher, an independent certified public accountant with Price Waterhouse & Co., who reviewed the records of G.S.I. Mr. Fabacher testified that there were many incomplete and missing records; however, he was able to determine that out of the monies borrowed from G.S.I. subsequent to January, 1985, that $550,000 was transferred by appellant to his personal bank account and used for personal reasons. Although Mr. Fabacher felt that more than $550,000 was funnelled from the company for appellant's personal use, Mr. Fabacher was positive only about this amount.
The trial court after considering both testimonial and documentary evidence, disallowed $550,000 of the $1,050,000 debt claimed to be owed by the former community to G.S.I., finding that appellant received those funds for his personal use and benefit after the termination of the community and in violation of injunction. We have reviewed the record involved in this issue and find that the trial court's assessment of the matter is not clearly wrong; accordingly, it is affirmed.[6]

III.
Appellant's remaining objection to the partition concerns the trial court's failure to include as a community liability $1,600,000 which appellant claims the community owes to his business partner, Kevin Lakins, for compensation earned under a bonus agreement.[7]
The bonus agreement is a written agreement executed between appellant and Lakins and J.D.I.C. Inc. and its subsidiary Gulf South Beverages represented by the owner James D'Spain (our appellant) on March 28, 1980.[8] The bonus agreement *317 was stated to be additional incentive and consideration to Lakins to continue his employment with J.D.I.C. and Gulf South. Lakins was to receive a bonus of four percent of all after-tax profits of the companies of Gulf South or J.D.I.C. or of any other business in the management of which Lakins participated.
Appellee excepted to Lakin's claim for monies due under the bonus agreement and asked that it be dismissed as prescribed. In support of her exception, appellee argued that under the terms of the bonus agreement (paragraph 4) all monies became due and payable within fifteen days from the sale of Gulf South Beverages on April 2, 1982. Accordingly, she argues that since Lakins failed to make any claim for these funds until December, 1985 (in his suit filed in 19th J.D.C. for the Parish of East Baton Rouge) and since these claims were for compensation for services rendered, then Lakin's present claim is prescribed under three year prescription. LSA-C.C. art. 3494.[9]
Appellant relies on two alternate provisions (paragraphs 1 and 2) of the bonus agreement and argues that prescription would not commence until the after-tax profits from the sale of Gulf South Beverages could be determined, which he alleges was after its holding company went into liquidation in March, 1983. Appellant additionally argues that after tax profits were not determinable until notes given in payment of the sale were paid, and until all contingent liabilities were paid. In the alternative, appellant argues that the ten year prescriptive period as provided by former LSA-C.C. art. 3544 applies to the bonus claim, not C.C. art. 3494; that C.C. art. 3494 cannot be applied retroactively; and that, in any case, prescription has been interrupted by the acknowledgment of the claim by appellant.
The trial court sustained the appellee's exception of prescription and dismissed the appellant's claim to this liability. The trial court further held that the former community is not responsible for any alleged debt due Kevin Lakins, said debt being the sole liability of the appellant.
As relates to commencement of prescription on the bonus claim, we have reviewed the Bonus Agreement, and we find, *318 as did the trial court, that prescription commenced fifteen days from the April 2, 1982 sale of Gulf South Beverages.
As relates to appellant's claim that prescription on Lakin's bonus has been interrupted by appellant's continuous acknowledgment that it is owed, LSA-C.C. 3464, assessments of credibility are properly left to the trial court, and, once again, we cannot say that the trial judge was in manifest error.[10]
Lastly, we address what we consider the most important of the issues raised by appellant in connection with the bonus claim: whether LSA-C.C. art. 3494 applies retroactively under the circumstances of this case.
Prior to the enactment of LSA-C.C. art. 3494, the prescriptive period which we would have applied to a claim for past compensation under a written contract to provide executive financial management services, would have been the ten year prescriptive period applicable to personal contracts. See Scallon v. Mark Petroleum Corp. 303 So.2d 498 (La.App.Cir. 2 1975), writ denied, 307 So.2d 370 (La.). However, when in 1983, the legislature added LSA-C.C. art. 3494, the prescriptive period for all claims for compensation for services rendered was changed to three years.[11]
The appellant argues that to apply LSA-C.C. art. 3494 retroactively to the facts of this case would unconstitutionally divest him of a vested substantive right.
Statutes of limitation are generally accorded retroactive application since they are remedial in nature. Lott v. Haley, 370 So.2d 521 (La.1979); Achord v. City of Baton Rouge, 489 So.2d 1373 (La.App.Cir. 1 1986), writ denied, 493 So.2d 641 (La.), cert. denied, ___ U.S. ___, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); statutes of limitation cannot be applied retroactively to disturb vested rights. A statute of limitations giving a shorter time for the bringing of actions than existed before does not necessarily affect the remedy to such an extent as to be an unconstitutional impairment of contracts, provided a reasonable time is given for the bringing of such actions Reichenphader v. Allstate Ins. Co., 418 So.2d 648 (La.1982). In Reichenphader, an approximate ten month period was deemed a reasonable time. See also, Matter of Filiation of Jones, 463 So.2d 961 (La.App. 3 Cir.1985); Ewing v. State Farm Mut. Auto Ins. Co., 402 So.2d 779 (La.App.Cir. 3 1981); Lee Hargrave, Louisiana Constitution 43 La.L.Rev. 505, 509 (1982).
In the present case Act. No. 173 of 1983 which added LSA-C.C. art. 3494 was published in the official Journal of the State on July 7, 1983. The law did not become effective until six months after publication on January 1, 1984. In our view the six months grace period granted by Act. 173 of 1983 is a reasonable period of time to permit persons affected by LSA-C.C. art. 3494 to assert their claims, especially when we note the availability of stringent methods of enforcing payment of wages.
As relates to the compensation allegedly owed here, it was not claimed until more than three years from the date the claim accrued, and two years after the publication of the statute. Under the circumstances we cannot say there is a denial of justice nor a violation of the due process guarantees of the state and federal constitutions.
We therefore hold that under the circumstances of this case, LSA-C.C. art. 3494 is to be given retroactive effect and that the community liability listed as notes payable to Kevin Lakin's on appellant's descriptive list is prescribed. However, we do note that out of the $1,495,000 claimed, that only $1,224,567 is for the prescribed Gulf South bonus. The trial court did not find *319 that the difference was prescribed. Accordingly, $270,433 would seem due except for the trial court's further ruling with which we agree, "that the community is not endebted unto Kevin T. Lakins ... any such alleged liability was not proven," and which is based on the failure of the appellant to show any profits of the companies under Lakins' direction subsequent to the sale of Gulf South Beverages.
For the reasons stated in this opinion, we affirm the trial court's judgment as rendered.
AFFIRMED.
KLIEBERT, J., concurs.
KLIEBERT, Judge, concurring.
I concur in the results reached by the majority but not necessarily for the reasons stated in the majority opinion.

ON REHEARING
We granted a rehearing in this case for the limited purpose of assuring appellant of our careful consideration of issues involving the community's percentage interest in the D'Spain Enterprise-Coursey Boulevard Partnership, and the method used to value same, and evaluation placed on this interest by the court. After due consideration of the matter, we reaffirm our original opinion.
AFFIRMED.
NOTES
[1] Less and except the property sold to Pelican Hometead & Savings Association in May , 1987 and to Commercial National Bank & Trust Company on July 3, 1985.
[2] In an instrument entitled "Sale and Assignment of Partnership Interest" said to be executed on November 27, 1984, appellant transferred to Lakins 10 percent of his partnership interest for the consideration of $209,545.
[3] The purchase price of the immoveable property totalled $7,650,000 less debts assumed of $4,018,176.52 and less the 45.87% interest already owned by our appellant and Lakins amounting to $1,665,917.43.
[4] See, Ramstack v. Krieger, 470 So.2d 162 (La. App.Cir. 4 1985) writ denied, 474 So.2d 1310 (La.). Held: Husband found not entitled to credit of income tax penalty that he would incur if he withdrew funds from retirement account; husband had option of withdrawing funds or leaving them in account for any length of time he chose.
[5] See now LSA-C.C. arts. 2801-2808.
[6] We note that appellant's claim that the trial court was initially satisfied that the $1,050,000 debt was used solely for community obligation, but forgot, is erroneous. Appellant claims that the final judgment rendered on July 6, 1987 is contrary to the trial court's ruling on this issue made on April 11, 1986. Our review of the record reveals that the ruling referred to by appellant dealt with appellant's use of proceeds from the sale of an airplane owned by the former community. The trial court did not rule on the validity of the $1,050,000 debt until April 28, 1986, at which time the trial court's ruling on the issue was consistent with his final judgment as rendered on July 6, 1987.
[7] This liability is listed on appellant's Sworn Descriptive List filed July 8, 1986: "Other Liabilities... d. Note Payable to Kevin Lakins valued at approximately $1,495,000."
[8] The Bonus Agreement reads in pertinent part:

BONUS AGREEMENT
. . . .
1. As additional consideration for the services heretofore rendered and hereafter to be rendered by Lakins to the Companies, as hereinafter defined, JDIC, Gulf South and D'Spain agree to pay to Lakins a bonus of four percent (4%) of all after tax profits of the Companies to be computed and paid as hereinafter set forth (the "Bonus").
. . . .
b. For the purposes of the Agreement, the term ... `after tax profits,' shall include, but shall not be limited to, capital gains realized and recognized from the sale or other disposition of any or all of the assets or stock of any or all of the companies....
2. The Bonus payable with respect to any fiscal year shall be paid in three (3) equal annual installments, the first installment of which shall be due and payable as soon as practicable after determination, as aforesaid, of the after-tax profits of the Companies but not later than the first day of March of the immediately following calendar year, and the second and third of which shall be due and payable on January 1 in the second and third immediately following calendar years. [For example, if the Bonus for the 1980 fiscal year of Gulf South is determined to be $75,000, then Lakins shall be paid $25,000 not later than March 1, 1981; $25,000 on January 1, 1982; and, $25,000 on January 1, 1983.]
3. The Bonus shall be earned by and be payable to Lakins as set forth in this Agreement unless Lakins unilaterally and voluntarily terminates his employment with all of the Companies, in which case Lakins shall receive, on the date of termination of said employment, the following:
a. The Bonus payable for the year in which the termination date occurs and, if said date occurs on a date other than December 31, then the Bonus shall be computed on the Companies' earnings as reported on the Companies' respective internal financial statements for the quarter (March 31, June 30 or September 30) most recently completed; and
It is understood and agreed that if Lakins terminates his employment under the circumstances set forth in the Section 3, then he shall waive and forego any and all rights to all installments and Bonuses payable in all years following the year in which termination occurs.
4. If Lakins' employment by JDIC or Gulf South or all of the other Companies is terminated for any cause whatsoever other than his voluntary and unilateral termination thereof, or if D'Spain dies or becomes disabled, or if Lakins dies or becomes disabled, or if all or substantially all of the stock or of the assets of JDIC or of Gulf South or of all of the other Companies is sold or otherwise transferred, or if JDIC or Gulf South, or both, shall merge or consolidate with another company and shall not be the surviving company, or if the business of JDIC or of Gulf South, or both, is discontinued for any reason, then Lakins (or, in the event of Lakins' death, his heirs, legal administrators or executors) shall receive, within fifteen (15) days from the date of occurrence or determination of any of the foregoing events, (i) the sums described in section 3(a) and 3(b) above, and (ii) all Bonus installments remaining to be paid for all years following the year in which said event occurs.
[9] Art. 3494. Actions subject to a three year prescription

The following actions are subject to a liberative prescription of three years:
(1) An action for the recovery of compensation for services rendered, including payment of salaries, wages, commissions, tuition fees, professional fees, fees and emoluments of public officials, freight, passage, money, lodging, and board; ...
[10] Appellant presented oral testimony from Lakins that he agreed to defer receipt of his bonus compensation in order that he and appellant might possibly acquire equity stock in a distributorship with Anheuser-Busch. The trial court found his testimony lacked credibility and observed that the debt owed Lakins was not mentioned in financial statements ending December 31, 1983 or June 30, 1984. The trial court then found that acknowledgment occurred in appellant's descriptive list filed on Janaury 8, 1986, after the running of prescription.
[11] LSA-C.C. arts. 3534, 3538 (Prior to repeal by implication by Act. 173 of 1983).