622 So.2d 1381 (1993)
Eves Thibodeaux MOODY
v.
Lamon L. MOODY, Jr.
No. 92 CA 1491.
Court of Appeal of Louisiana, First Circuit.
July 2, 1993.
Rehearing Denied September 14, 1993.
*1382 Melanie A. Kleinpeter, Baton Rouge, for plaintiff-appellee Eves Thibodeaux Moody.
Paul T. Thompson, Baker, for defendant-appellant Lamon L. Moody, Jr.
Before WATKINS, CRAIN and GONZALES, JJ.
WATKINS, Judge.
The community of acquets and gains formerly existing between Mr. Lamon L. Moody, Jr. and Eves Thibodeaux Moody terminated on October 27, 1987. Pursuant to partition proceedings instituted by Mrs. Moody, the trial court rendered judgment on July 2, 1991, allocating the community of assets and liabilities between the parties and ordering a cash equalization payment to Mrs. Moody. Mr. Moody appealed the judgment alleging the following assignments of error.[1]

*1383 ASSIGNMENT OF ERROR NO. 1.
Mr. Moody contends that the trial court erred in valuing the capital stock of Dyer & Moody, Inc., a community corporation, at $5.45 per share. Mr. Moody claims that this value is based on values placed on the stock three years before trial and that the trial court's value ignores the testimony of two experts called by the respective parties to testify as to the value of the stock.
In concluding that the stock should be valued at $5.45 per share, the trial court stated the following in its oral reasons for judgment.
Dyer & Moody is essentially Mr. Moody. Therefore, I will allocate the 40,000 shares of Dyer & Moody to Mr. Moody.
The court usually determines whether a price is fair by whether someone is willing to buy or sell at that price. Mr. Moody has suggested the price of two dollars and forty-nine cents advocated byor calculated by Mr. Butler but is unwilling to sell to his wife at that figure. So I do not feel that that figure is a valid figure.
The special meeting of the board of directors, P-18it appears to be October 5, 1987indicates that president Moody had the power and authority and the sole discretion to sell treasury stock to himself as an individual stockholder and, apparently, still has that power. The price of the shares was set at five dollars and forty-five cents effective May 25th, 1987, and "until such time as the board of directors changes such price per share, all sales, transfers, conversions, and registration of certificates per shares of capital stock shall be at this price per share." Mr. Ted Heil, [an employee] was bought outP-19 is the checkat five dollars and forty-five cents a share. It appears from P-18, which has not been changed, that if I set a price at two dollars and forty-nine cents per share for Mrs. Moody's stock, Mr. Moody would have the right to sell it to the corporation at five dollars and forty-five cents at any time that he wished to leave the corporation. That seems patently unfair that he would get it at two dollars and fifty cents and be able to turn around and sell it for five dollars and forty-five cents. If Mrs. Moody was simply a shareholder and this were not a community property case, she would be able to call on the corporation or offer it first to the corporation, and the corporation could buy her stock at five dollars and forty-five cents a share. Therefore, I think that the price of five dollars and forty-five cents a share is the proper price. The court notes that Mr. Dyer, to whom Mr. Moody was not married, actually was paid seven dollars a share for stock in this closed corporation.
At trial Mr. Moody offered the testimony of John Butler, a certified public accountant, who kept the books for Dyer & Moody Corporation. Mr. Butler testified that in determining the value of the Dyer & Moody stock he used five commonly accepted valuation methods and averaged the results of the different methods to arrive at a per-share price of $2.49.[2] Mr. Butler also explained that according to internal revenue service ruling 59-60, eight other factors should be considered in addition to the mathematical calculations. His report to Mr. Moody summarizes the ruling as follows:
Revenue Ruling 59-60 states:
Because valuations cannot be made on the basis of a prescribed formula, there is no means whereby the various applicable factors in a particular case can be assigned mathematical weight in determining the fair market value. For this reason, no useful purpose is served by *1384 taking an average of several factors (for example, book value, capitalized earnings, capitalized dividends) and basing the valuation on the result. Such a process excludes active consideration of other pertinent factors, and the end result cannot be supported by a realistic application of the significant facts in the case except by mere chance. The ruling goes on to list eight factors that enter into the process:
1. The nature of the business and the history of the enterprise....
2. The economic outlook in general and the condition and out look of the specific industry in particular....
3. Book value of the stock and the financial condition of the business....
4. The earning capacity....
5. The dividend paying capacity....
6. Whether or not the enterprise has goodwill or other intangible value....
7. Sales of stock....
8. Market price of stock of corporations engaged in the same or similar line of business....
Although Mr. Butler elaborated on each factor with regard to Dyer & Moody, he did not give an opinion as to its effect on the price of the stock.
To establish the value of the stock of Dyer & Moody, Mrs. Moody offered the testimony of Ms. Debra White, a certified public accountant. Ms. White testified that her valuation of the corporation was based solely on the audited financial statements prepared by Mr. Butler and that she did not see any supporting data. Using the same five valuation methods used by Mr. Butler, Ms. White determined the per-share value of Dyer & Moody to be between $3.47 and $4.56.[3] However, an error was discovered in Ms. White's computations which reflected that her value of $4.56 was based upon dividing the results of the five different methods by three instead of five, which would have yielded an average per share value of $2.74.
The difference in valuations computed by Ms. White and Mr. Butler are attributable mainly to the fact that Ms. White dropped the lowest and highest years from 1985 through 1990 in making her valuations and the fact that Mr. Butler discounted the value of the immovable property owned by the corporation by 10% per year from 1987 to 1990.
LSA-R.S. 9:2801(4)(a) provides that the court shall value assets as of the time of trial on the merits. See McGehee v. McGehee, 543 So.2d 1126, 1128 (La.App. 1st Cir.), writ denied, 548 So.2d 327 (La.1989). Furthermore, the determination of the fair market value of the community stock in Dyer & Moody is a factual determination which will not be disturbed absent manifest error. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
In this case the trial court used a value placed on the stock by the board of directors of Dyer & Moody at a special meeting of the directors in 1987, when the board's purpose was to determine a value for the stock in order to repurchase the stock of an employee. The value of $5.45 per share was determined by the board notwithstanding the determination by its C.P.A., Mr. Butler, that the stock, according to his calculations, was worth $2.75 per share. The corporate records also reveal that the stock of Dyer & Moody has been bought and sold since 1969 for between $5.00 and $7.00 per share. The expert testimony presented at trial by the opposing C.P.A.s established a value of between $2.49 and $3.47 per share; however, each expert admitted that the value was calculated upon the historical financial information of Dyer & Moody and not the intangible *1385 considerations mentioned in IRS ruling 59-60.[4]
It is evident from the record before us that the $5.45 stock value determined by the Board of Directors in 1987 was not an attempt to determine the true fair market value of the corporation at that time. It was more in the nature of a compromise wherein the corporation agreed to pay $5.45 for the repurchase of a small amount of corporate stock from an employee. We believe that it was error for the trial court to rely on this evidence in the face of current values testified to by the experts at trial.
Based on the testimony at trial, we believe that the record supports a value of $3.47 per share, which reflects the net economic worth of the corporation according to Ms. White's calculations.[5] The net economic worth method reflects the fair market value of net assets and excludes any good will. We believe that this method most accurately determines the actual worth of the company in the face of no other supporting information regarding the various intangible factors discussed. Accordingly, we find that the value of the 40,000 shares of community stock is $138,800.00.

ASSIGNMENT OF ERROR NO. 2.
In this assignment of error Mr. Moody contends that the trial court erred in refusing to order any reimbursement to him for mortgage payments made on the community home after termination of the community.
According to LSA-C.C. art. 2365, Mr. Moody is entitled to be reimbursed for one-half of the separate funds used to pay community debts. The mortgage payments were clearly a community debt, and the trial court erred in refusing to order reimbursement of one-half of the amount of Mr. Moody's separate property used to satisfy the community obligation, i.e., mortgage principal, interest, property taxes, and insurance since the date of termination of the community. See Williams v. Williams, 590 So.2d 649, 655 (La.App. 3rd Cir.1991). The record establishes that Mr. Moody paid a total of $10,281.00 in mortgage payments since the date of termination of the community. Accordingly, he is entitled to be reimbursed $5,140.50 from Mrs. Moody's share of the net value of the community. Williams v. Williams, 509 So.2d 77, 81 (La.App. 1st Cir.1987).

ASSIGNMENT OF ERROR NO. 3.
Finally, Mr. Moody contends that the trial court erred in finding that a balance of $25,796.18 existed at the time of termination of the community in a super fund account at the First State Bank and Trust Company. Mr. Moody argues that the evidence presented at trial only supported a finding that the super fund account contained $20,000.00 and that, of that amount, $19,510.33 was proven to be the separate property of Mr. Moody.
The record reveals that a super fund account at First State Bank, Baker, Louisiana, No. 7603991 in the amount of $25,796.18 appears as item 6 on Mrs. Moody's amended sworn detailed descriptive list. Mr. Moody's traversal of Mrs. Moody's amended sworn detailed descriptive list disputed the community nature of the funds but did not contest the amount of the funds. The trial court determined that of the $25,796.18, Mr. Moody proved that $17,400.00 of the funds were his separate funds; consequently, the remaining $8,396.18 was declared to be community funds. The findings of the trial court are supported by the record herein and will not be disturbed.
Mr. Moody also assigns as error the trial court's valuation and allocation of assets; however, his brief to this court only complains of the valuations which we have *1386 already disposed of in the previous assignments. We also note that Mrs. Moody has attempted to assert several allegations of error in her brief to this court. However, because she has neither appealed nor answered the appeal, we do not address those alleged errors since we can give her no relief beyond that given her by the trial court. Carollo v. Wilson, 353 So.2d 249 (La.1977).

DECREE
For the reasons set forth, the trial court judgment is amended to decrease the value of the Dyer & Moody stock to $138,800.00. Further, the finding of the trial court denying Mr. Moody reimbursement for payments from his separate estate on the community mortgage is reversed. The judgment is affirmed in all other respects and we remand for reallocation of assets and liabilities in accordance with the awards mandated herein.
REVERSED IN PART; AMENDED IN PART, AND REMANDED.
NOTES
[1] Mrs. Moody filed a motion to dismiss the appeal; however, the motion was denied by this court on February 9, 1993.
[2] The five valuation methods consisted of:

1. Book Value $2.63
2. Economic Net worth $3.32
3. Capitalization of Earnings $3.30
4. Capitalization of Cash flow -0-
5. Price earnings ratio $ .50
 Total $9.95

Mr. Butler testified that he excluded the valuation for capitalization of cash flow and used the four remaining values to determine the per-share value of the stock.
[3] Ms. White's calculations yielded the following values:

1. Book value $2.62
2. Economic net worth $3.47
3. Capitalization of earnings $1.82
4. Capitalization of cash flow $1.94
5. Price-earnings factor $3.83
 Total $13.69

[4] The profitability of Dyer & Moody from 1985 through 1990 as reflected in its financial reports is as follows:

 9/30/85 9/30/86 9/30/87 9/30/88 9/30/89 9/30/90
Net Income $23,851 $23,757 $ 1,207 $23,327 (79,314) $24,995

The loss of income in 1989 is attributable in part to a recapitalization of accrued vacation in the amount of $30,976.00.
[5] We chose the net economic value calculated by Ms. White because we do not believe that Mr. Butler adequately supported his decision to reduce the value of the immovable property of the corporation, as appraised in 1987, by 30%.