714 So.2d 231 (1998)
Linda Gail HEAD, Nee Evans, Plaintiff-Appellant,
v.
Kenneth York HEAD, Defendant-Appellee.
No. 30585-CA.
Court of Appeal of Louisiana, Second Circuit.
May 22, 1998.
*232 Robert S. Noel, II, Monroe, for Plaintiff-Appellant.
James A. Hobbs, West Monroe, for Defendant-Appellee.
Before MARVIN, C.J., and HIGHTOWER and STEWART, JJ.
MARVIN, Chief Judge.
In this community property dispute between ex-spouses, Linda Evans Head appeals, complaining of those parts of a judgment that valued the community stock in a family corporation and ordered Kenneth Head to pay her an equalizing payment at eight percent per annum interest in 120 monthly payments. She seeks to have us increase the value of the community stock and to order the equalizing payment to be made in one cash payment.
Linda Head's complaints strike at the trial court's discretion to weigh and assess expert testimony and to order the equalizing payment to be made, "either [in] cash or deferred, secured or unsecured, upon such terms and conditions as the Court may direct." La. R.S. 9:2801(4)(c).
We reverse and remand with directions for these reasons:

FACTS
A divorce petition filed August 4, 1994, eventually resulted in a judgment terminating the 27-year marriage of Kenneth and Linda and dissolving the community estate as of August 4, 1994. Kenneth was the majority stockholder and principal officer in a family corporation, H & H X-Ray, Inc., having purchased his father's interest in the corporation during the marriage. The community stock is 77.78 percent, or 70 shares, of the 90 outstanding corporate shares. It was allocated to Kenneth in the partition.
Kenneth's expert appraiser, Guillot, and Linda's expert appraiser, Booth, used the same method in valuing the corporate worth or the value of all shares: the capitalization of normalized earnings at a 25 percent capitalization rate. Guillot assigned a net value to the 77.78 percent share of the former community of $114,671, while Booth assigned *233 a net value of $552,297. The trial court accepted and used Guillot's evaluation in its calculations to reach the amount of the equalization payment.
The difference between the expert figures stems from Guillot reducing the value of the company by applying a minority/marketability discount of 35 percent, which Booth did not use, and by Booth increasing Guillot's net cash flow for 1996 of $56,704 to $177,524 by adding to the cash flow the value of "perks" given or paid by the corporation to or for Kenneth and his family, including some personal expenses.
To reach his figure of $177,524, Booth increased Guillot's annual cash flow estimate by the annual payments by the corporation on a personal recreational vehicle used by Kenneth's father ($10,592); insurance premiums for a policy owned by the corporation insuring Kenneth's life ($12,480); net rental payments to Kenneth ($25,748) for vehicles he rented to the corporation, and the total of "other fringe benefits" to Kenneth of $72,000. The $72,000 total derives from the value of a corporation-owned tractor used exclusively and personally at the family home; the value of three trucks used by Kenneth and the Head's two sons, plus the corporation's payment of the cost of gasoline, oil and other maintenance expenses and insurance premiums on these vehicles; some personal travel and entertainment expenses of Kenneth paid by the corporation and the wages paid by the corporation to the younger Head son, age 16.
Each appraiser based his opinions on annualized earnings from financial records of the corporation through September 30, 1996.
H & H X-Ray, Inc., is an established business that serves the oil and gas industry by inspecting pipelines.

DISCUSSION
The trial court did not give detailed reasons for judgment, why the trial court accepted Guillot's 35 percent minority/marketability discount or why it did not consider any of the "perks" to or for Kenneth and his family.
The record explains that Kenneth's father's use of a recreational vehicle provided by the corporation was a part of the contract by which the father sold his interest in H & H to Kenneth during the marriage. The record also explains that the corporation-owned or leased trucks are provided employees (including Kenneth and his sons) who are "on call" at all times because the business works with radioactive materials. The trucks Kenneth and his sons use are bought by Kenneth and rented to the corporation for a fixed monthly amount. Kenneth uses part of the rental payments to repay loans made to him to purchase the vehicles and reports the rental payments as income on his tax return. When a new vehicle is purchased and leased to H & H for Kenneth's use, the vehicle Kenneth was driving at the time of the purchase is then used by one of his sons or another H & H employee. At the time of trial, the community owned nine vehicles which were leased to H & H.
A Case tractor is listed on the corporate depreciation schedule. Kenneth apparently uses the tractor on his personally-owned pasture on which several head of cattle owned by him and his family are maintained. Booth, however, mistakenly used the value of a dozer listed in the schedule to estimate the value of this "perk."
The policy insuring Kenneth's life for $1 million is owned by the corporation and is pledged to secure the indebtednesses owed by the corporation to two banks. These indebtednesses (totaling about $350,000) are also personally guaranteed by Kenneth Head. Booth reasoned that the corporation overinsured Kenneth's life because the corporate line of credit was only $600,000 and a term policy could be obtained for a lesser premium. The record does not allow us to determine the cost of either the lesser insurance or the term insurance. Further, the policy had accumulated earnings of $20,000 from premiums paid in excess of the cost of insurance.
Likewise, the record does not establish what the younger son was paid nor the hours worked [answering telephones and relaying messages to his father]. Kenneth said ten to 20 hours a week, for his working after school, sports practice and games. Booth merely gave an estimated value of the various "other *234 fringe benefits" such as the value of personal use and expenses of H & H leased vehicles by Kenneth and his sons, Kenneth's personal travel and entertainment. Booth based his value of these "perks" on his experience working with other businesses.
The record establishes that Kenneth purchased several vehicles which he leased to H & H. H & H paid Kenneth more than $32,000 in 1996 for such rentals. He reported net rental income in 1996 as $25,748. These vehicles were allocated to Ken at book value in the court's allocation of community assets, some at a negative value, although they were clearly income-producing assets of the former community.
Assets of the community are to be valued as of the time of trial on the merits. La. R.S. 9:2801(4)(a); Moody v. Moody, 622 So.2d 1381 (La.App. 1st Cir.1993); McGehee v. McGehee, 543 So.2d 1126, 1128 (La.App. 1st Cir.1989).
To value corporate stock, the court is required to assess and weigh the testimony of the two expert witnesses. Business valuations methods are not an exact science and are basically guides to determine a fair market value for buyers and sellers of a given business. Here, the evaluation is made for the purpose of resolving community property disputes. Given the dynamics of businesses and business practices, factoring in circumstances that may be unique to the parties, an inflexible formula for determining value is said to be impractical. Achee v. National Tea Company, 95-2556 (La.App. 1st Cir. 12/20/96), 686 So.2d 121, 125.
Linda argues that the trial court failed to account for Kenneth's personal expenses and benefits paid through the company which diminished net cash flow and thus the value of the company in the expert's calculations. Of course, findings of fact, such as the value of the community stock in H & H, are the trial court's province, which should not be disturbed unless found manifestly erroneous. Moody v. Moody, supra, p. 1384.
Generally, the trier of fact is not bound by expert testimony, but is to hear and weigh expert testimony in the same manner as any other evidence. Reasonable and well-founded opinion should be considered. Watts v. Watts, 552 So.2d 738, 740 (La.App. 1st Cir.1989). The weight to be given expert testimony is dependent upon the professional qualifications and experience of the expert and especially on the facts on which that expert's opinion is based. Goodwin v. Goodwin, 618 So.2d 579 (La.App. 2d Cir.1993).
The fact-trier is entitled to assess the credibility and accept the opinion of an expert just as with other witnesses, unless the stated reasons of the expert are patently unsound. The effect and weight to be given the expert's testimony depends upon the validity of the underlying facts relied upon by the expert, and rests within the broad discretion of the trial judge. Chance v. Chance, 29591 (La.App.2d Cir. 5/7/97), 694 So.2d 613, 617.
The expert witnesses agreed that capitalization of earnings is the most appropriate approach to value the H & H stock. They also agreed that a perk is a monetary benefit to a business owner-employee not usually given to an ordinary employee. As noted, the difference in value arises out of what corporate expenses are "perks" to be added back to the net cash flow for valuation and out of the application of the minority marketability discount used by Guillot but not by Booth.

Net Cash Flow
Guillot calculated the net cash flow for 1996 as $56,704 by annualizing the first nine months' financial information. Booth accepted and used Guillot's cash flow figure to reach his adjusted calculations.
Guillot reached the net cash flow first by taking the estimated gross profit for 1996 and deducting from it amounts for operating expenses, including, among other things, general and administrative expenses, lease/rental expense and depreciation, as well as deducting amounts for interest expense. He then added other net income, such as gain on assets sold, and subtracted the estimated tax liability, to reach a total net income of $15,220. To derive net cash flow from net income, Guillot added back the noncash depreciation *235 expense and deducted amounts for capital expenditures, changes in net working capital, and net changes in long-term debt.
Accepting Guillot's net cash flow of $56,704, Booth reached an adjusted net cash flow by adding back to the cash flow amounts expended by the company for the items he considered perks to Kenneth, expenses which he considered unnecessary to the business and which would not be available to ordinary employees: $10,592 for payments on the father's RV, the $12,480 life insurance premiums, the $25,748 net rental income received by Kenneth from the company, and $72,000 for "other fringe benefits." Thus, Booth's adjusted net cash flow totaled $177,524, as compared to Guillot's $56,704.

Calculation of Value of H & H
Guillot capitalized the cash flow 25 percent and reached a fair market value of $226,816. This value was then reduced by a 35 percent minority/marketability rate. Guillot said he used this discount because the H & H stock was not publicly sold. Guillot valued the 90 outstanding shares at $147,430 and the former community's 70 shares at $114,671.
Booth reached a value of $710,096 for the 90 shares, using Guillot's 25 percent capitalization rate after adjusting the net cash flow to $177,524, and reaching a value of $552,297 for the community's 70 shares. Booth did not apply any discount for lack of marketability of the community stock because H & H was not being sold but continued under the same ownership and management.

Adjusted Net Cash Flow
Both experts agreed it is the usual practice in business valuation to add the value of perks back to the net cash flow when using the capitalization of earnings method. The issue here is whether the trial court was clearly wrong in its implied conclusion that none of the "perks" Booth identified as such should be added back to the net cash flow.
Our analysis focuses on whether the net cash flow of H & H was unnecessarily reduced by what, if any, "perks" and the applicability of the minority/marketability discount.

Payment for Recreational Vehicle
The recreational vehicle for Kenneth's father was evidently part of the sales agreement when Kenneth purchased his father's interest in H & H. Guillot conceded the RV was a perk, but opined this expense did not diminish the value of the company because the payment was not shown in "cost of sales", but was reflected in the equipment category on the corporate books. We note, however, that the RV is not listed or identified on the corporate depreciation schedule.
The RV payments perhaps include payment of interest on a purchase money loan, which may be included in the interest expense deducted to derive H & H's net income and thus may reduce the corporate cash flow. However, this record does not allow us to ascertain what, if any, part of the payment is or is not included in the interest expense. With respect to the RV, we cannot find the trial court's decision clearly wrong.

Other Fringe Benefits
Booth's calculation of adjusted net cash flow included "other fringe benefits" of $72,000. This total includes the value of the use of the tractor owned by H & H which Linda said was used only at the house and in the pasture; the value and expense of personal use of three company trucks; personal travel and entertainment expenses paid for by H & H, and some wages paid by H & H to the Heads' 16-year-old son, Toby.
Booth identified the tractor on the depreciation schedule as an item listed as a "dozer." The depreciation schedule lists both a Case tractor and a dozer. Kenneth was questioned about a "dozer tractor" and said "it" was for use in the business and had been purchased for contracting work but had not been used in contracting.
Linda testified Kenneth kept a corporate owned tractor at home and used it in his pasture. She presented no evidence as to the specific value of the personal use of the tractor. Booth referred to the cost of the dozer, rather than the tractor and did not assign a separate value to its use.
Kenneth also testified that he used a tractor, which he owned personally, rather than a dozer to plant his pasture. However, we *236 note the tractor is not listed on Kenneth's detailed descriptive list, and there is a tractor listed on the corporate depreciation schedule. The record does not show by what amount Kenneth's personal use of the tractor reduced H & H's cash flow.
Likewise, the value and expense associated with personal use of the company vehicles by Kenneth and his two sons is not clear from the record. It appears that Booth included part of the purchase price of three of the many vehicles on the depreciation schedule, and an estimated cost of operating and maintaining three vehicles for a year, based on his experience with other small businesses that provided vehicles for personal use of employees. He did not examine the H & H books to reach more exact estimates.
While Booth's characterization of the personal use of company vehicles as a perk may be correct, the record does not contain factual support of his estimate of the amount to add back to the net cash flow for these perks. Nor do we have sufficient factual support to distinguish what amount is estimated for Kenneth's personal travel and entertainment as distinguished from business travel and entertainment.
Linda raised the issue of the wages or salary paid to the younger son, Toby, as a perk. Linda's post-trial brief acknowledges that the $6,000 amount she says was paid Toby is a "guess." Even if the wages paid to Toby were not actually earned, the record does not show how much the business paid Toby.
The trial court accepted Guillot's opinion that these items should not be added back to net cash flow. While some of the items Booth included in "other fringe benefits" may be true perks, with both experts agreeing that true "perks" should be added back to the net cash flow, we cannot say that the trial court was clearly wrong in rejecting Booth's opinion on adjustment of the net cash flow by $72,000. This record does not include supporting facts that allow us or the trial court to conclude that the $72,000 perk total should be added back to the cash flow.

Goodwill
Linda also argues in brief that goodwill should have been considered in connection with evaluating the business. Goodwill is recognized as an incidental property right in connection with commercial businesses. Its value may properly be included in the evaluation of a community-owned commercial business, in contrast to a one-person "professional" corporation where the goodwill results solely from the identity of the professional and his or her personal relationship with patients or clients. Chance v. Chance, supra; Godwin v. Godwin, 533 So.2d 1009 (La.App. 1st Cir.1988).
Notwithstanding that goodwill may be considered in a commercial business, this record is silent with respect to the value of H & H's goodwill. While we recognize that goodwill is an intangible [the probability that the customers of an established business will continue their patronage, according to Godwin, supra, p. 1010], we cannot place a value on goodwill from the financial statements. Neither expert assigned a value to goodwill. As mentioned, H & H remains an established business under the same management. Omission of a value for goodwill under these circumstances presents no error.

Life Insurance Premium Expense
The life insurance policy is, according to Guillot's testimony, assigned to the bank to secure H & H's $600,000 line of credit. It is designated an "adjustable life policy." It is not a term life insurance policy.
The policy statement shows a level planned premium of $525 a month, or $6300 annually. It also reflects net premiums received of $6,174, interest earned on the accumulation value of $1,072, and a total insurance deduction of $2823 [the actual amount charged by the company for the $1,000,000 death benefit] for the policy year from November 1994 to November 1995.
The annualized premium payments being made to the insurance company for the policy in 1996 was apparently $12,480. Booth testified that this was the annual amount based on his review of H & H records, and neither Guillot nor Kenneth disputed the accuracy of this amount. The letter accompanying the *237 statement says that the policyholder may submit additional premium payments if desired, which would be earning interest at the rate of slightly over six percent. Thus, the policyholder may pay a level planned premium amount, which by itself exceeds the cost of the insurance, or even an additional amount if the interest rate is particularly attractive.
The statement shows that premium payments to the insurer in excess of the actual cost of the insurance accumulate tax deferred earnings which are credited to the account of the policyholder. In November 1995, the policy had an accumulation value [earning slightly over six percent interest], although not a cash surrender value, of over $20,000.
The letter accompanying the statement shows that the monthly insurance deductions from the premium payments for the next year [November 1995 to November 1996] were less than $235 a month, so that the true annual cost of insurance for 1996 was $2810, as compared to the total annual premium payments for that year of $12,480.
Guillot considered the insurance policy was not a perk, and the 1996 annual premium cost need not be added back to the net cash flow, because the bank holding the business's $600,000 line of credit, which Kenneth had personally guaranteed, required Kenneth to be insured and to assign the policy to the bank.
Booth contended that Kenneth was overinsured by the policy as the line of credit was only $600,000, so that any coverage over the required amount was a perk to Kenneth. He also asserted that the fact that the excess premium payments above the cost of insurance accumulated earnings showed that the type of policy purchased was not a necessary expense of the corporation. Booth added the total annualized 1996 premium [$12,480] to the net cash flow in calculation of value.
Linda argues that Kenneth could have obtained a term life insurance policy for much lower premiums so any excess premium paid is a perk. We have no evidence in the record as to what the reasonable premium for a $600,000 term life policy would be for a man Kenneth's age.
The record clearly establishes, however, that the policy is, in part, an investment vehicle. The total amount characterized as premium is not needed to purchase the insurance coverage. The amount to cover the cost of insurance is deducted from the amount paid, and the remainder is invested, probably at the direction of the insured or the owner of the policy [Kenneth, in this case, whether as insured or as the majority shareholder of H & H].
The excess premium over the cost of insurance should not be considered a corporate expense because part of this money is credited to H & H's investment account and accumulates earnings. Therefore, Guillot's opinion that the total amount paid for Kenneth's life insurance is a legitimate expense and not a perk is patently unsound. The difference between the total cost of insurance for 1996 [$2,810] and the total premiums paid in 1996 [$12,480 less $2,810], which is $9,669, should have been added back to the net cash flow in valuing H & H.

Rental Income Paid by H & H to Kenneth Head
Booth added $25,748 to net cash flow reported by Kenneth as net rental income from vehicles and equipment he personally purchased and leased to H & H in 1996. Kenneth declared this net amount on his personal income tax return, also showing gross rental income of over $32,000.
Guillot said he did not consider the net rental income paid to Kenneth by H & H as a perk to be added back to cash flow because the amounts appeared reasonable, except those for Kenneth's and his wife's automobiles, and to correspond with monthly note payments on some newer trucks. Guillot acknowledged, however, that Kenneth received rental payments of $50 or $100 a month from H & H on some older trucks or vehicles that had been fully paid for by Kenneth and listed on the community assets at a low or negative value.
Some of the vehicles rented to H & H were shown on Kenneth's detailed descriptive list apparently at blue book value, two at a negative value. They were not valued as income producing property, although Kenneth *238 received annual net rental income of over $25,000.
If the vehicles had been purchased by H & H, the business could claim a depreciation deduction which would be added back to the net cash flow for valuation purposes. Once the purchase money loan was paid, H & H would have no rental expense associated with the vehicle. Further, the trade-in or sale value would benefit the business, rather than Kenneth personally. This benefit to the corporation would show up in the corporate financial statement as a gain on assets sold, which affects net profit and in turn affects net cash flow.
Booth opined that had vehicles been leased from a vendor in an arms length transaction, the monthly lease payments would be lower than the monthly note on a purchase money loan because there would be no equity buildup by the lessee.
With the lease arrangement, Kenneth personally acquires an income producing asset paid for, in principal and interest, by H & H. The rental paid to Kenneth on these vehicles (which include those for his family's personal use) affords Kenneth personal income, personal tax benefits, and personal ownership of property which are not afforded to an ordinary nonstockholder employee.
This is not to suggest that a lease arrangement between a principal share owner and the corporation is improper. It is simply a method Kenneth chose to shift income from H & H to Kenneth, who purchases and enjoys personal as well as business use of some vehicles. The lease remains in place even after the corporation has completed the payments covering Kenneth's indebtedness on the vehicles, although the rental amount is lowered. Kenneth thus legitimately realizes additional income from H & H other than as salary. While proper, this scheme reduces the cash flow of H & H. The lease of vehicles from Kenneth has a negative effect on H & H's net cash flow and a positive effect on Kenneth's personal income and legitimate tax avoidance.
We find Guillot's opinion that the rental expense of these vehicles paid by the business to Kenneth are not perks to be patently unsound. Kenneth's net rental income of $25,748 should have been added back to net cash flow.

Calculation of Value of H & H
Guillot devalued Linda's interest in H & H by a 35 percent minority/marketability discount. He said the capitalization discount rate was derived from rates which apply to a minority interest in a publicly traded business. He reasoned that because H & H was privately held, its value should be further discounted as is done in sales of privately held businesses.
Booth opined that marketability is not a factor in determining value in cases in which a business is not being sold to a third party. He explained that the minority/marketability discount rate only applies in cases where a privately held corporation is valued for purposes of reaching a mutually agreeable sales price in a sales contract between the owner(s) and a third party.
H & H is a family business which has been in existence for more than 20 years. Kenneth worked with his father and purchased his father's interest in the business. Kenneth's two sons apparently work with him in the business. Kenneth mentioned in his testimony that one of his sons would continue to run the business after him. The record establishes the probability and Kenneth's intent that H & H will continue to be a family-owned business providing for the Head family.
Where a sale of the business to a third party is not contemplated, the value of the stock should be determined without discounting for lack of marketability. Under these circumstances, the fact that H & H stock is not publicly traded does not warrant application of the discount to reduce the value of Linda's interest. See and compare Mexic v. Mexic, 577 So.2d 1046, 1050 (La. App. 4th Cir.1991).
Adding back the amounts which were shown to be perks to the net cash value of $56,704 ($9,669 in insurance investment funds and $25,748 in net personal rental income) yields an adjusted net cash flow of $92,121 as the basis for calculating the value of H & H according to the formula used by both Guillot and Booth. Application of the capitalization rate of 25 percent yields a value *239 of the company of $368,484. The community owned 77.78 percent of the outstanding stock, the value of which is $286,607, without minority/marketability discount. On this record, this is the lowest value of the range within the trial court's discretion. This value should have been used in the partition of the assets of the former community.

Calculation of Equalizing Payment
Having determined the value of the community interest in H & H as $286,607, we must now recalculate the equalizing payment which Kenneth owes to Linda as a result of the allocation of the community assets and liabilities. We accept the allocation of other former community properties, values assigned to same and credits granted in the trial court. The parties agreed on the values other than the former community stock. The allocation and valuation by the court of other assets is not questioned on appeal.
Linda was allocated:

Property description Net value
The family home and five acres of land $ 76,896.40
Undivided one-half interest in Lot 20, Minorca River Lot $ 4,000.00
1993 Lincoln Continental -$ 4,223.47
1992 Range boat $ 8,000.00
Massachusetts Mutual life insurance policy $ 2,500.00
 ___________
Total net value of property received by Linda $ 87,172.93
Kenneth was allocated:
Property description Net value
62 acres of land $ 90,066.80
1991 Ford F250 4×4 truck $ 2,000.00
1992 Ford F250 4×4 truck $ 2,500.00
1993 Ford F250 4×4 truck -$ 1,052.00
1992 Ford F250 4×4 truck $ 2,500.00
1987 Chevrolet Astro van $ 800.00
1991 Ford F250 4×4 truck $ 2,000.00
1992 Ford F250 4×4 truck -$ 1,789.54
1994 Ford F250 4×4 truck $ 3,565.18
1994 Ford F250 4×4 truck $ 2,842.09
Massachusetts Mutual life insurance policy (# 7536448) $ 5,033.08
Massachusetts Mutual life insurance policy (# 7536446) $ 1,020.24
Life insurance policy # 60155236 $ 14,728.70
One-third interest in cattle[1] $ 2,250.00
Stock in H & H X-Ray, Inc. $286,607.00
 ___________
Total value of property received by Kenneth $413,071.55
Less credit for community debts paid with separate funds -$ 41,781.39
 ___________
Net value of property received by Kenneth $371,290.16
Value of Kenneth's community property $371,290.16
Value of Linda's community property $ 87,172.93
 ___________
Total value of community property $458,463.09
One-half value of community $229,231.54
Less value of property received by Linda -$ 87,172.93
 ___________
Equalizing payment owed by Kenneth to Linda $142,038.61

*240 Deferred and Unsecured Payout

The trial court calculated an equalizing payment owed by Kenneth to Linda of $114,181.23, directing this amount to be paid to Linda in 120 monthly installments at eight percent interest. Linda contends the trial court erred in this respect. Kenneth contends that it was within the court's discretion under La. R.S. 9:2801(4)(c) and that the judgment in Linda's favor provides her "protection." We disagree.
The court is required to divide the community assets and liabilities so that each spouse receives property of an equal net value. La. R.S. 9:2801(4)(b). In order to avoid an unequal net distribution of assets and liabilities, the court may order the payment of an equalizing sum of money, either cash or deferred, secured or unsecured, upon specified terms and conditions; and the court may order the execution of notes, mortgages, other documents as it deems necessary, or may impose a mortgage or lien on either community or separate property as security. La. R.S. 9:2801(4)(c). [Our emphasis].

Hare v. Hodgins, 586 So.2d 118, at p. 123 (La.1991).
Although it was evident when the parties agreed upon allocation the day of the trial that, with the business and 62 acres of land being allocated to Kenneth along with community movables, there would be an equalizing payment owed, Kenneth did not request the trial court to defer payment. We are unable to discern from the record a reason for the trial court's unsolicited deferral of an unsecured equalizing payment, particularly without imposing terms and conditions for the deferral as the statute directs. A cash payment, of course, would not require terms and conditions other than payment.
While the ideal resolution of a community property partition, when equalizing is necessary, would include a cash payment to end the dispute, the ordering of deferred and unsecured payments appears facially to be within the discretion provided by R.S. 9:2801(4)(c). The "terms and conditions" facially appear to be also within the trial court's discretion.
The trial court's statutory range of discretion should depend on the individual circumstances of each case. See the first paragraph of La. R.S. 9:2801(4)(c), providing that the court should consider, in its allocation of assets and liabilities, the nature and source of the asset or liability, the economic condition of each spouse and any other circumstance the court deems relevant. These same considerations should be applied to a determination of the "terms and conditions" of any deferred equalizing payment required for an equitable allocation of the community.
Although we recognize the trial court's statutory discretion, in this particular case the judgment awarding monthly payments does not afford protection of Linda's interest as a judgment creditor of Kenneth. Kenneth's immovable property [of the former community] (62 acres) is assigned a net value of $90,066. The equalizing payment exceeds even that value.
The judgment, of course, is a money judgment in Linda's favor (a judicial mortgage), but it only accrues one month at a time, similar to a judgment for the payment of monthly child support. The judgment provides no acceleration clause in the event of default in payments. In the event Kenneth failed to make a payment, Linda could execute her judgment only for the amount of one month's payment, or the specific number of monthly payments in default. Without a provision that the entire amount becomes due in default of a monthly payment, Linda must resort to multiple costly procedures to enforce payment. Neither the statute nor the judgment for the equalizing payment contains a provision for the debtor to pay the creditor's attorney's fees if the debtor defaults.
We must find that the trial court abused its discretion by deferring the equalizing payment *241 without providing for either or both acceleration of the debt upon default and security of adequate value to satisfy the amount of the equalizing payment. A trial court should not place a creditor spouse in such a position, but should impose "terms and conditions" appropriate to the particular circumstances when it defers the equalization payment.
Requiring Kenneth to sign a promissory note secured by all of the community property allocated to Kenneth in the partition, including the H & H stock, is authorized and contemplated by the statute.

CONCLUSION
For the foregoing reasons, we shall amend the judgment of the trial court to increase the equalizing payment owed by Kenneth to Linda to the sum of $142,038.61. We shall remand to the trial court with directions to require Kenneth to sign a secured promissory note in this amount payable on the same terms and conditions provided by the trial court judgment [subject to a credit for monthly installments which have been paid], containing an acceleration clause in the event of default of one payment, a reasonable attorney fee provision, to be executed as a mortgage note paraphed by Kenneth with a properly recorded mortgage of all property of the former community allocated to Kenneth.

DECREE
We reverse and remand to the trial court with directions to enter judgment herein in favor of LINDA GAIL HEAD, NEE EVANS, and against KENNETH YORK HEAD in the sum of $142,038.61, payable in 108 equal monthly installments at eight percent interest per annum, and directing the said KENNETH YORK HEAD to sign a secured promissory note as mentioned, containing an acceleration and attorney fee provision, paraphed and secured by a properly recorded mortgage of the property of the former community allocated to KENNETH YORK HEAD in the community property partition.
Costs of this appeal and on remand are assessed to KENNETH YORK HEAD.
NOTES
[1] The post trial ruling shows this as one-half interest, but the testimony is clear that the community owned a one-third interest and each of the Heads' sons owned a one-third interest in the cattle.