790 So.2d 759 (2001)
Dianne Ranier COLLIER
v.
James D. COLLIER.
No. 00-1263-CA.
Court of Appeal of Louisiana, Third Circuit.
July 18, 2001.
*760 Jack Derrick Miller, Attorney at Law, Crowley, LA Counsel for James D. Collier.
*761 Helen J. Popich, Attorney at Law, Lafayette, LA, Counsel for Dianne Ranier Collier.
Ted Matthew Anthony, Lafayette, LA, Counsel for Dianne Ranier Collier.
Court composed of NED E. DOUCET, Jr., C.J., JIMMIE C. PETERS, and MARC T. AMY, Judges.
PETERS, Judge.
James D. Collier appeals certain aspects of a judgment partitioning the community property existing between himself and his former wife, Dianne Ranier Collier. Finding merit in some of Mr. Collier's arguments, we grant part of the relief requested on appeal and amend the trial court's judgment.
James and Dianne Collier were married on February 3, 1971, and divorced by a judgment signed November 4, 1996. Thereafter, Mr. Collier sought a partition of the community property acquired during the marriage. The disputed issues were litigated in a two-day trial beginning June 30, 1999. After completion of the trial, the trial court took the matter under advisement and, on August 20, 1999, issued written reasons for judgment dividing the community assets and liabilities, addressing the reimbursement claims each litigant had against the other, and concluding that Mr. Collier owed Mrs. Collier an equalizing payment of $154,050.73. The trial court then signed a judgment conforming to the written reasons on April 18, 2000. In his three assignments of error on appeal, Mr. Collier takes issue only with the trial court's valuation of a closely held community corporation, Petroleum Resources Management Corporation (PRMC), and the calculation of the equalizing payment.

Assignment of Error Number 1:
In his first assignment of error, Mr. Collier asserts that the trial court erred in determining that PRMC was not a professional corporation and in adding a value for goodwill to the corporation's valuation. We find merit in this assignment of error.
In its reasons for judgment, the trial court correctly recognized that "[u]nder Louisiana matrimonial regime law, goodwill is recognized as an incidental property right in connection with commercial businesses which [are] capable of sale and transfer from one owner to another." See Godwin v. Godwin, 533 So.2d 1009 (La.App. 1 Cir.1988), writ denied, 537 So.2d 1165 (La.1989). Additionally, the trial court correctly recognized that "with a professional corporation, where the goodwill results solely from the identity of the professional or from his or her relationship with clients or patients, goodwill is not included." See Head v. Head, 30,585 (La.App. 2 Cir. 5/22/98), 714 So.2d 231; Chance v. Chance, 29,591 (La.App. 2 Cir. 5/7/97), 694 So.2d 613; Preis v. Preis, 94-442 (La.App. 3 Cir. 11/2/94), 649 So.2d 593, writs denied, 94-2939, 94-2942 (La.1/27/95), 649 So.2d 392.
Two experts testified concerning the value of PRMC. George Joseph Trappey, III, a New Iberia, Louisiana certified public accountant (CPA), testified on behalf of Mr. Collier and valued the corporation at $77,000.00. John William Wright, a Lafayette, Louisiana CPA, testified on behalf of Mrs. Collier and valued the corporation at $280,789.00. The two experts used totally different approaches to reach their individual conclusions. Mr. Trappey assumed that the corporation is a professional corporation in determining which methodology to use, while Mr. Wright assumed that it is a commercial corporation. The separate approaches resulted in Mr. Wright *762 including a business goodwill value in his total while Mr. Trappey did not. However, Mr. Wright did not specifically place a monetary value on the goodwill element but simply stated that its value was "built in" the formula he used in his calculations.
Accepting Mr. Wright's commercial corporation assumption as fact, and apparently including some value for goodwill, the trial court placed a value of $210,000.00 on the corporation. "The determination of the value of this business is a factual one which will not be disturbed absent manifest error." Monje v. Monje, 94-622, p. 4 (La.App. 5 Cir. 12/28/94), 648 So.2d 1086, 1088. Additionally,
Where factual determinations are based on determinations regarding the credibility of witnesses, the manifest error standard of review demands great deference to the trier of fact's findings. This rule applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound.
Warwick Apartments Baton Rouge v. State, Through Dep't of Transp. and Dev., 930162, p. 6 (La.App. 1 Cir. 3/11/94), 633 So.2d 895, 898 (citations omitted). It is obvious that the trial court gave great weight to Mr. Wright's evaluation of PRMC while giving little or no weight to the testimony of Mr. Trappey.
Although goodwill may be included in the value of a commercial corporation, it must be given a value. Head, 30,585, 714 So.2d 231. Mr. Wright did not assign a value for the goodwill he included in his total. While referring to goodwill in its reasons for judgment, the trial court assigned no value as well. We need not consider whether the record establishes a value for goodwill because we find Mr. Wright's reasons for his expert opinion patently unsound.
Mr. Collier holds a bachelor of science degree in mechanical engineering and is licensed by the state as a professional engineer in the field of petroleum engineering. He formed PRMC in 1990 as a consulting engineering firm, and Mr. Collier is the president and sole shareholder of the corporation. According to Mr. Collier, the corporation provides "consulting services, consulting personnel, engineering evaluations, property evaluations and so forth to the [oil and gas] industry." The corporation's clients include large and small oil companies.
The corporation employs only three full-time individuals other than Mr. Collier. Two of the employees, Steven Sere and Michael Wellborn, are petroleum engineers, and the third, Mary Onebane, is the office manager. On a regular basis, the corporation retains outside consultants or contractors, many of whom are engineers, to supervise drilling and other oil and gas activity on behalf of its clients. PRMC then bills its client for the cost of the consultants/contractors and adds a small percentage to the bill for its services in retaining and supervising the consultants/contractors. The financial records of the corporation indicate that in 1998, the consultants/contractors generated over sixty percent of the corporation's income. While Mr. Collier does not disagree with that percentage, he asserts that when the corporation is viewed as a whole, these services are professional engineering services. According to Mr. Collier, the firm derives approximately ninety-five percent of its revenue from professional engineering services, which he suggests includes the services rendered by he and the two engineer employees, as well as the outside consultants/contractors.
The percentage of income from the outside consultants/contractors forms the primary basis of Mr. Wright's conclusion that *763 PRMC is a commercial corporation. According to Mr. Wright, the bills submitted for the professional services provided to the oil and gas industry constituted nothing more than the "cost of goods sold." He compared the practice to a "Kelly Services" operation wherein the parent company supplies labor to others in the marketplace. Mr. Wright described PRMC as nothing more than "a bunch of different companies ... a conglomeration." He reached this conclusion because of the many different services supplied by the corporation, even though all were supplied to the oil and gas industry. In his opinion, "in a professional service corporation, you're ordinarily selling yourself" and not the services of others. Ordinarily, according to Mr. Wright, to be considered a professional corporation, ninety-five to one hundred percent of the corporate revenue should come from rendering professional services. However, in reaching his conclusion, Mr. Wright admitted that he never investigated Mr. Collier's specific duties in the corporation. Additionally, he made no inquiries to determine exactly what the term "engineering services" actually entailed in the industry, nor did he inquire of the consequences of Mr. Collier's withdrawal from the corporation.
We find Mr. Wright's conclusion that PRMC is a commercial corporation to be overly simplistic and fatally flawed. It cannot be disputed that one who is properly licensed to practice in a recognized field of engineering is a "professional." See La.R.S. 37:681, et seq. A "professional engineer" is defined as "a person who, by reason of his special knowledge and ability to apply the mathematical, physical, and engineering sciences and the principles and methods of engineering analysis and design, acquired by an engineering education and engineering experience, is qualified to practice engineering, as evidenced by his licensure as such by the [Louisiana Professional Engineering and Land Surveying Board]." La.R.S. 37:682(4). Additionally, La.R.S. 37:682(10)(a) provides that the "`[p]ractice of engineering' shall mean responsible professional service ... when such professional service requires the application of engineering principles and the interpretation of engineering data." Clearly, Mr. Collier is a professional engineer.
The law also recognizes those corporations formed pursuant to the Architectural Engineering Corporation Law, La.R.S. 12:1171, et seq., as professional architectural or engineering corporations. Such corporations must function through at least one designated supervising engineer who has properly been registered with the Louisiana Professional Engineering and Land Surveying Board. The supervising engineer must be a full-time active employee of the corporation, and his primary occupation must be with the corporation. La.R.S. 12:1173(B)(2). Important to the analysis in this case is the fact that in the event the designated registered engineer "ceases to become a full-time active employee of the corporation or is no longer employed by the corporation on a primary basis, the authority of the corporation thereafter to practice engineering" in its designated branch of professional engineering, "is suspended until such time as the corporation designates another supervising engineer." La.R.S. 12:1173(E). Moreover, professional engineering corporations are subject to regulation by the Louisiana Professional Engineering and Land Surveying Board in basically the same manner as are individual professional engineers. La.R.S. 37:689.
As stated in GLENN G. MORRIS & WENDELL H. HOLMES, 8 LOUISIANA CIVIL LAW TREATISE: BUSINESS ORGANIZATIONS § 42.02, at 448 (1999):

*764 A professional corporation can render professional services only through individuals licensed to practice in this state. Of course, that does not prevent the corporation from hiring as employees individuals who, by custom and practice, are not usually considered to be rendering professional services.
(Footnotes omitted).
Thus, the conclusion that as much as ninety-five percent of the corporate income must be directly produced by the principal owner of the professional corporation for it to retain its professional status is error.
Reginald J. Ringuet, PRMC's attorney, who primarily represents companies in the oil exploration business, described PRMC as a corporation engaged in the rendition of professional consulting and engineering services. According to Mr. Ringuet, an example of a service corporation is one that "lays pipelines in the Gulf of Mexico." Such a corporation will "hire boats, hire welders, and they bid a job and they go out and lay the pipe." In his opinion, "PRMC is more of a professional organization" because it advises companies relative to the drilling of wells, the operation and management of their property, and other matters relative to the exploration and development of oil producing properties.
In essence, Mr. Wright ignores the very nature of the profession of petroleum engineering in reaching his conclusion that PRMC is a commercial corporation. A petroleum engineer's work requires the application of mathematical, physical and engineering sciences and the principles and methods of engineering analysis and design. Not only is he involved in the exploration for oil and gas reservoirs, but once discovered, these reservoirs require methods for recovery and maintenance, as well as the termination of recovery operations at some time in the future. Petroleum engineers are involved directly in planning and implementing those methods. After recovery begins, the petroleum engineer assists in the recovery operation by utilizing time-tested engineering principles in an effort to ensure the safety of human life and the surrounding environment. The consulting services provided by PRMC are not "non-engineering related services" as suggested by Mr. Wright, but are the very essence of petroleum engineering.
The record also establishes that Mr. Collier bore the responsibility of locating the consultants, reviewing their qualifications, and supervising their activities on behalf of PRMC's clients. Doctors, lawyers, and accountants frequently consult with and hire others in the same profession as well as individuals outside their profession, often in the same manner as PRMC. Their firms, if incorporated, are still viewed as professional corporations notwithstanding the hiring out of certain aspects of their professional businesses. In fact, Mr. Wright acknowledged that his CPA firm was departmentalized to provide different services for different clients.
Mr. Wright's error in concluding that PRMC is a commercial corporation requires rejection of all his testimony concerning the corporation's value. In fact, Mr. Wright acknowledged that, assuming that PRMC is a professional corporation, the methodology applied by Mr. Trappey in reaching his conclusion would be proper.
Mr. Trappey not only reviewed corporate records (including the financial statements of the corporation from 1992 through March 31, 1999, the corporate tax returns for the last five years before trial, and the general ledger for 1998 and the first three months of 1999), but he also interviewed Mr. Collier, Mr. Ringuet, and Mr. Morella, the corporate accountant. With these records and the information *765 obtained in the interviews, he used the "net asset value method" to determine the corporation's net asset value of $102,675.00 as of March 31, 1999. Mr. Trappey then reduced this value by twenty-five percent and reached a final value of $77,000.00. He stated that this twenty-five percent "marketability discount" was necessary because, "in a closely held corporation, you can't call up your stockbroker and sell that stock tomorrow. It's not a marketable security .... you can't just do it overnight. It would take some time to liquidate these assets." Additionally, according to Mr. Trappey, anyone considering purchasing PRMC would expect a substantial discount in price because of two pending lawsuits against PRMC testified to by Mr. Ringuet. According to Mr. Trappey, a contingent liability, such as a pending lawsuit, "is a substantial problem that affects the valuation of this company."
Mr. Wright testified that, although he agreed with Mr. Trappey's methodology in analyzing a professional corporation, he disagreed with certain adjustments made by Mr. Trappey, particularly the twenty-five percent reduction. However, he stated no basis for his disagreement.
We find Mr. Trappey's calculations and conclusions to be supported by the record and set the value of the corporation at $77,000.00. In doing so, we find merit in Mr. Collier's first assignment of error.

Assignment of Error Number 2.
In this assignment, Mr. Collier asserts that the trial court erred in failing to consider PRMC's obligations to certain key employees, namely Steven Sere, Michael Wellborn and Mary Onebane. Mr. Collier testified that soon after forming PRMC, he and the three employees entered into discussions about dividing the corporate stock. However, this division of stock did not occur because of the adverse tax consequences that would follow such a transfer. Mr. Collier testified that he and the three employees agreed to "develop an agreement between us whereby we would distribute profits, proceeds, etcetera, whether it be from oil and gas, which one of our goals was to acquire oil and gas interests and develop some significant value there, which is the only way to develop any significant value within this organization, that should those assets, the revenues generated by those assets and so forth, should we ever reap any significant benefit from those assets or a sale of the company, that they would share in that, that their portion would be distributed to them."
Mr. Ringuet testified that he was aware of the "understanding," but there exists nothing in writing formalizing the agreement. He further testified that he participated in discussions with Mr. Sere and Mr. Wellborn regarding the agreement and confirmed that these discussions occurred "well before the divorce suit was filed as well as after[.]"
Mrs. Collier testified that she was unaware of any such obligations to these employees, but she acknowledged that Mr. Collier seldom discussed business affairs with her.
Mr. Wright, who also worked for Mr. Sere in his capacity as a CPA, testified that he had discussed Mrs. Collier's claims against her husband with Mr. Sere and the potential impact these claims would have on PRMC's obligations to Mr. Sere. However, Mr. Wright further testified that this discussion was of a friendly nature, not business, and he merely convinced Mr. Sere that he was not in danger of losing his job at PRMC because of the claims brought by Mrs. Collier against Mr. Collier.
The record contains no other evidence that anyone other than Mr. Collier owns stock in PRMC. Thus, the ownership *766 issue is a question of fact that hinges on a credibility determination by the trial court. "A court of appeal may not set aside a trial court's or jury's finding of fact in the absence of `manifest error' or unless it is `clearly wrong.'" Stobart v. State, Through DOTD, 617 So.2d 880, 882 (La. 1993). Relative to this issue, the trial court stated the following in its reasons for judgment:
Mrs. Collier contends that although giving the employees an interest in the corporation may have been discussed, no action was taken that would transfer ownership. She points out that Mr. Collier received the sole profit distributions from PRMC and was the only person to receive a K-1 statement from the company. (See PRMC's Federal Tax Returns, Exhibit R-3, R-4 and R-5). Mr. Collier was the only employee with a company car. He was allowed to borrow money from the bank at an interest rate lower than that paid by PRMC for a loan from the bank. Mr. Collier was allowed to charge PRMC for the expert services of Mr. George Trappey to evaluate PRMC for the purposes of Mr. Collier's divorce suit. There is no indication that Mr. Sere or the other alleged beneficial owners enjoyed such special benefits.
No documentary evidence was introduced to support the claim that the other three employees own an interest in the company. None of the alleged beneficial owners testified at trial in order to prove their ownership. Considering the evidence presented, the Court finds that Mr. Collier has failed to prove that the other employees are beneficial owners of PRMC.
We find no manifest error in the trial court's factual determinations on this issue and find no merit in this assignment of error.

Assignment of Error No. 3.
In his final assignment of error, Mr. Collier asserts that the trial court erred in requiring that he pay an equalizing payment of $154,050.73 to Mrs. Collier when the community assets could have been divided in such a manner as to avoid the necessity of an equalizing payment. In considering this assignment of error, we must first evaluate the effect our decision in Mr. Collier's first assignment of error has on this issue.
By finding merit in the first assignment of error, we have reduced the net community estate by $133,000.00 ($210,000.00 $77,000.00). Without any other action on our part, our decision would have the effect of reducing the equalizing payment to $87,550.73 ($154,050.73$66,500.00).
Louisiana Revised Statute 9:2801(4)(c) provides the guidance to the trial court for allocating the community assets and liabilities after they have been determined and valued. That provision reads as follows:
The court shall allocate or assign to the respective spouses all of the community assets and liabilities. In allocating assets and liabilities, the court may divide a particular asset or liability equally or unequally or may allocate it in its entirety to one of the spouses. The court shall consider the nature and source of the asset or liability, the economic condition of each spouse, and any other circumstances that the court deems relevant. As between the spouses, the allocation of a liability to a spouse obligates that spouse to extinguish that liability. The allocation in no way affects the rights of creditors.
In the event that the allocation of assets and liabilities results in an unequal net distribution, the court shall order the payment of an equalizing sum *767 of money, either cash or deferred, secured or unsecured, upon such terms and conditions as the court shall direct. The court may order the execution of notes, mortgages, or other documents as it deems necessary, or may impose a mortgage or lien on either community or separate property, movable or immovable, as security.
In effecting a fair partition of community property, the trial court is vested with great discretion. See Poirier v. Poirier, 95-394 (La.App. 3 Cir. 11/2/95), 664 So.2d 532. Reviewing the distribution of assets by the trial court, and considering the effect of the reduction of the equalizing payment by this court, we find no abuse of discretion in the trial court's equalizing determination.

DISPOSITION
For the foregoing reasons, we affirm the trial court's award of an equalizing payment to Dianne Ranier Collier but amend the award by reducing it to $87,550.73. We affirm the judgment in all other respects. All costs of this appeal are taxed to Dianne Ranier Collier.
AFFIRMED AS AMENDED.