978 So.2d 941 (2007)
Julia P. MORGAN
v.
STATE FARM FIRE AND CASUALTY COMPANY, INC., Darnell Browning, Superior Services Industry, Inc. and William Rogers d/b/a Lake Park Laundry.
No. 2007 CA 0334.
Court of Appeal of Louisiana, First Circuit.
November 2, 2007.
*942 Kris A. Perret, Baton Rouge, LA, for Plaintiff/Appellant Julia P. Morgan.
Joseph N. Lotwick, Baton Rouge, LA, for Defendant/Appellee B & G Construction and Restoration, Inc.
Daniel A. Reed, Baton Rouge, LA, for Defendant/Appellee Republic Vanguard Insurance Company.
Before WHIPPLE, GUIDRY, and HUGHES, JJ.
GUIDRY, J.
A homeowner appeals a judgment dismissing her claims against a contractor she hired to repair her home after a fire. Having thoroughly reviewed the evidence in the record before us, and finding no error in the determinations of the trial court, we affirm.

FACTS AND PROCEDURAL HISTORY
On March 27, 1999, a fire that emanated from the fireplace damaged the home of Julia P. Morgan. Ms. Morgan was at home at the time of the fire. She maintained a policy of homeowner's insurance covering her home with State Farm Fire and Casualty Company (State Farm), and immediately called her agent to report the occurrence. The agent arrived at Ms. Morgan's home on the night of the fire and brought with him Barry Jenkins, the owner of B & G Construction and Restoration (B & G). Thereafter, Ms. Morgan contracted with B & G to perform the repair work on her home. The company commenced the work approximately four weeks after the date of the fire and completed the work in October 1999.
Apparently dissatisfied with how her claim was processed, on the one year anniversary of the fire, Ms. Morgan filed suit against State Farm and her agent, Darnell Browning, alleging that based on the failure to properly adjust her claim, she was *943 not fully compensated for all the losses she suffered and that her home remained in a state of disrepair. Also in that petition, Ms. Morgan made claims against the companies that cleaned her home and clothes following the fire. She later amended her petition to name additional companies and individuals that performed work on her home relative to the fire, which claims and defendants are not at issue in the matter before us.
However, critical to this appeal is Ms. Morgan's first supplemental and amending petition in which she named B & G as a defendant based on its alleged failure to make the repairs to her home in a "timely, professional and workmanlike manner." This petition was filed on October 13, 2000, and B & G answered the petition denying Ms. Morgan's claims. Ms. Morgan later filed a second supplemental and amending petition naming Republic Vanguard Insurance Company as a defendant as the insurer of B & G.
After extensive pretrial discovery, motions, and interlocutory rulings, the trial court finally heard the claims asserted against B & G on June 14, 2006. Ms. Morgan testified at the trial and presented the testimony of a witness accepted by the trial court as an expert in estimating and construction. Mr. Jenkins testified on behalf of B & G. After considering the testimony and other evidence presented, the trial court took the matter under advisement and later rendered judgment in favor of B & G, finding Ms. Morgan failed to present sufficient evidence to prove that B & G failed to repair her home in a workmanlike manner. It is from that judgment, signed August 22, 2006, that Ms. Morgan appeals, asserting that the trial court erred in not accepting as true the uncontradicted testimony offered by her expert witness and in reaching conclusions that she maintains are not supported by the record.[1]

DISCUSSION
The primary evidence relied on by Ms. Morgan in presenting her claim is the testimony of Winston Wood, accepted by the; trial court as an expert in estimating and construction. It is Ms. Morgan's contention that Mr. Wood's testimony was uncontradicted and clearly established her right to recover the damages claimed. On review, we find no support for these arguments.
At trial, Mr. Wood testified that he inspected Ms. Morgan's home in 2003, nearly four years after the fire and repair work in 1999. Based on his inspection, Mr. Wood documented the following as problems he observed regarding the repair of the home: paint sloughing off surfaces throughout the house, including moldings; stained bathroom tub that should have been replaced or resurfaced and sealed; mold accumulating in a closet as a result of overflow from the air conditioning system; a hole in the wall in the hallway caused by the closet rod on the communicating wall of the closet with mold in it; nails not properly securing decking of the roof to the rafters; hole around a vent near the attic bigger *944 than the vent, allowing hot air from the attic to reach the cold air of the interior of the house and possibly causing mold to develop; failure to spray joists, rafters and decking in the attic with a sealant to kill any odor from the fire and smoke that absorbed in the wood; air conditioner unit in attic not properly supported or anchored; tile in kitchen that was beginning to crack that needed to be replaced; a crack in kitchen countertop; bifold doors in kitchen that needed to be replaced; damage starting to show to wooden floors, either from improper installation or moisture from the overflowing air conditioning unit; and failure to use the same quality and type of wood to make repairs to the roof and in the attic.
Based on the defects observed, Mr. Wood opined that the work performed on Ms. Morgan's house was either unsupervised or substandard. However, on cross examination, Mr. Wood admitted that he did not know what the condition of the house was when Ms. Morgan moved back into it after B & G had completed its work in October 1999. As for the damage noted in the wall in the hallway, Mr. Wood stated:
Well, I'm not quite sure the mechanism, how the hall wall got damaged from the other side, unless the bracket that was supporting the shelf and the rod itself when it fell just punched a hole through it, because this sheetrock wall was on the opposite side of the stud from where the problem was created.
As for the spraying of the joists and rafters in the attic with a sealant, he clarified his testimony regarding whether a sealant had been sprayed on those surfaces by admitting "[w]ell, it didn't appear to be." Mr. Wood also admitted not knowing when the crack in the kitchen floor had occurred. In explaining his testimony regarding the quality of the wood used to repair the fire damage to the roof, Mr. Wood stated:
If I was going to replace the roof with like and quality, I'd  unless someone asked me to raise it for some reason, I would put it back like it was, and if they wanted tongue and groove, I'd use tongue and groove. If they didn't, I'd use plywood and give them a credit that they could use on something else or they wouldn't pay me that money.
Following Mr. Wood's testimony, Mr. Jenkins, the owner of B & G, was called to the stand to testify, and contrary to Ms. Morgan's assertion on appeal, his testimony, as well as several exhibits introduced in conjunction with his testimony, did contradict the opinion and statements of Mr. Wood in several respects.
First, regarding the peeling paint observed on several surfaces in the house, Mr. Jenkins testified that when B & G began its work, it was observed that there was a pre-existing problem of where someone had previously painted over the oil based painted surfaces with a latex paint. Mr. Jenkins testified that B & G sought authorization from State Farm to completely strip the surfaces before repainting them so that the paint would adhere properly, but the request was denied. He said that the most State Farm would authorize was to sand and repaint the surfaces with latex paint.
As for other needed repairs noted by Mr. Wood, Mr. Jenkins testified that State Farm refused to authorize replacement of the bi-fold doors because it deemed the damage observed to those doors not to be related to the fire. He also testified that State Farm would not authorize the resurfacing of the stained tub and tub surround because State Farm had determined that the stained condition of the tub and the tub surround was pre-existing and simply a result of age. State Farm further would *945 not authorize the changing the bathroom chair and door molding for the same reason. The house was built in 1955.
Nevertheless, Mr. Jenkins stated that there were many repairs that B & G performed gratuitously for Ms. Morgan that were not authorized by State Farm nor related to the fire. For instance, in the kitchen, Ms. Morgan complained of a crack in her kitchen counter. Mr. Jenkins testified "[t]his was something that was not figured by State Farm, and we didn't break the formica, but she said she didn't remember a crack being in it, so we ended up changing her formica." He stated that B & G also installed smoke detectors, unsealed several windows that were nailed or painted shut, and ran a sub-feed breaker panel inside her home to allow Ms. Morgan to control her breakers without having to go to the main panel located on the outside of her home, all free of charge.
When questioned regarding the cracks in the tile floor of the kitchen and defects in the wooden floors noted by Mr. Wood and shown in the photos taken by Mr. Wood, Mr. Jenkins responded that he had not observed any defects at the time B & G completed its work. As for the hole in the hallway wall that Mr. Wood speculated, but could not say for certain, was caused by the rod in the closet on the opposite side of the communicating wall, Mr. Jenkins testified:
[T]hat . . . is a hole in a wall, which is  looks like a lot greater than a screw hole left from shelving. This butts up to the closet that we added on. That closet Ms. Morgan wanted wire shelving in it. James Murphy is the wire shelving guru in Baton Rouge, and when he goes in to put the wire shelving in, he will actually  there's a schematic that he uses, depending on the distance of the wall, . . . his schematic goes up, adjusts to it, and it lays out all the screw holes. Now, it's not to say that the screw holes are all going to line up on studs. He has inserts that are made to hold the shelving properly to hold clothing and whatever is stored on it, other than something that is maybe just overweighted (sic), but by the picture, it's hard for me to believe that a plastic insert would make a hole on the opposite side this large, because this is in the hallway, and I can't imagine  because it looks like it's a foot and a half wide.
As for the work on the roof, in the attic, and on the air conditioning system, Mr. Jenkins testified that the decision to move the air conditioning unit from the downstairs closet to the attic was done to accommodate Ms. Morgan's request to raise the level of her roof to give her more space in the attic. By raising the roof, B & G was able to move the air conditioning unit from a hallway closet to the attic and thereby give Ms. Morgan the hallway closet she wanted. To offset the cost associated with raising the deck of the roof the decision was made to use a lesser, but acceptable quality of wood, with Ms. Morgan's agreement. As Mr. Jenkins explained, the "[r]oof decking therefore is not [of] like kind and quality as called for by the policy. That is correct, but the moneys (sic) were used to raise the pitch of her roof from three to a seven, taking, in the items that I aforementioned, meaning decking, roofing, framing."
Mr. Jenkins also testified that a sealant was sprayed on the joists and rafters in the attic. He explained that B & G used two types of sealant  one that leaves a white residue and one that is clear. Mr. Jenkins stated that the clear sealant was used on the surfaces noted by Mr. Woods. As for bracing the air conditioning unit that was placed in the attic, Mr. Jenkins observed that while Mr. Wood had noted that the air conditioning unit was braced *946 only by a two-by-four, "it's not a two by four, but its three two by fours. This was inspected by the city on the rough-in and the final and approved by the city." Mr. Jenkins further commented that all of the work performed, including the nailing of the decking to the rafters, was inspected and approved by the various city building inspectors in the fields of mechanical, electrical and framing. Copies of the inspections approving the work as of September 23, 1999, were placed into evidence.
Mr. Jenkins stated that the air conditioning unit that was in the hall closet was replaced with a new unit that was placed in the attic. He explained that contrary to Mr. Wood's testimony, the replacement unit was not smaller, but was actually a bigger unit. The old unit was a two and a half ton unit, and the new unit was a three-ton unit. Mr. Jenkins said that Guy Fontenot performed the work on the inside air conditioning unit, and that at the time the work was performed, Mr. Fontenot advised Ms. Morgan to change the outside air conditioning unit as the two systems might be incompatible and the newer system could put pressure on the older unit, but she declined to do so. He said Ms. Morgan never informed him of any problems with the air conditioning unit and that she did not even call him when the condenser on the outside unit went out. Instead, she called Mr. Fontenot directly.
According to Ms. Morgan, in September 2000, she experienced problems with the outside air conditioning unit and called Total Comfort Heating and Air to inspect the unit. She was advised to replace the outside air conditioning unit, but she did not have Total Comfort Heating and Air perform the work. Instead, she had her son's friend, who worked for an air conditioning company, perform the work. It was after that work was performed, in either 2001 or 2002, that she began experiencing problems with overflow from the inside air conditioning system.
In considering expert testimony, the trial court may accept or reject in whole or in part the opinion expressed by an expert. The effect and weight to be given expert testimony is within the broad discretion of the trial judge. Rao v. Rao, 05-0059, p. 14 (La.App. 1st Cir.11/4/05), 927 So.2d 356, 365, writ denied, 05-2453 (La.3/24/06), 925 So.2d 1232. The trier of fact may accept or reject any expert's view, even to the point of substituting its own common sense and judgment for that of an expert witness where, in the fact-trier's opinion, such substitution appears warranted by the evidence as a whole. Green v. K-Mart Corporation, 03-2495, p. 5 (La.5/25/04), 874 So.2d 838, 843; Barber Brothers Contracting Company v. Cuccia, 98-0675, p. 8 (La.App. 1st Cir. 4/1/99), 734 So.2d 820, 824, writ denied, 99-1258 (La.6/18/99), 745 So.2d 31. The decision reached by the trial court regarding expert testimony will not be disturbed on appeal absent a finding that the trial court abused its broad discretion. Fishbein v. State ex rel. LSU Health Sciences Center, 06-0549, p. 8 (La.App. 1st Cir.3/9/07), 960 So.2d 67, 73, writs denied, 07-0730, 07-0708 (La.6/22/07), 959 So.2d 495, 505.
In his testimony, Mr. Jenkins stated that B & G tried to be responsive to Ms. Morgan's requests and complaints, even to the extent of performing work that was not authorized or paid for by State Farm. Ms. Morgan submitted several "punch" lists, or lists of repairs that Ms. Morgan noted as being needed. The last list of repairs that Ms. Morgan submitted to Mr. Jenkins was in May 2000, and Mr. Jenkins described to the court what repairs were performed, and if a repair was not performed, Mr. Jenkins explained that it was usually something that was not authorized *947 by State Farm. Mr. Jenkins further explained to the court that several of the defects observed by Mr. Wood did not exist at the time B & G completed its work and Ms. Morgan never informed B & G of any subsequent problems.
Having reviewed the evidence and testimony as outlined above, we find no abuse of the trial court's discretion in choosing not to give greater weight to Mr. Wood's testimony. We further find that the evidence supports the trial court's findings.

CONCLUSION
After a thorough review of the record in its entirety, we find that the record before us contains sufficient evidence to support the trial court's judgment. Accordingly, the judgment is affirmed. All costs of this appeal are assessed against the appellant, Julia P. Morgan.
AFFIRMED.
NOTES
[1] In its reasons for judgment, the trial court held:

The court finds that the expert testimony of Mr. Wood for the Plaintiff was not compelling as his review of the property in question occurred many years after the B & G work had been completed. There was evidence produced that additional additions/modifications to the house were made in the intervening years which, together with wear and tear associated during that time, rendered Mr. Wood's opinions almost worthless to the court. In fact, many of the problematic areas addressed were the result of defective separate work on the exterior air conditioning unit at a later date by others.