PETTIGREW, J.
Lin this matter, defendant-appellant, Margaret Garrison Trahan[1], challenges a judgment rendered in family court involving a community property partition and the determination of claims arising under special contractual terms of a marriage contract entered into by Mrs. Trahan and plaintiff-appellee, Scott David Trahan. For the reasons that follow, we amend in part, and as amended, affirm.
FACTS AND PROCEDURAL HISTORY
The parties were married on December 20, 1998. Prior to the marriage, the parties entered into a marriage contract on December 10, 1998, providing that certain property would be the separate property of Mr. Trahan and other property would be the separate property of Mrs. Trahan. Otherwise, the contract provided that the legal regime of the community of acquets and gains would exist between the parties. No children were born of the marriage. Mr. Trahan filed a petition for divorce on August 23, 2007, alleging the parties had lived separate and apart since February 15, 2007, and requesting a divorce based on La. Civ.Code art. 103(A)(1). On September 4, 2007, Mrs. Trahan filed an answer and reconventional demand, alleging *221 a separation date of June 20, 2007, and requesting a divorce based on La. Civ. Code art. 102. The matter was submitted by affidavits and stipulations, and, after consideration of same, the family court judge agreed that the parties were separated in June 2007. A judgment of divorce was signed by the court on January 29, 2008.
According to the record, the parties acquired various properties during the marriage, which was subject to a combination community, joint, and separate property regime, pursuant to the December 10,1998 marriage contract. Because the parties were not able to reach an amicable community property partition and settlement of all claims between them arising from the marriage, Mrs. Trahan filed a petition for judicial partition |sof property on September 7, 2007, requesting a partition of the property in accordance with La. R.S. 9:2801, “as well as a full accounting of all rights and claims of the parties, of every nature and kind, including placing in possession of all separate property and recognition of separate claims.” On November 28, 2007, Mr. Trahan filed a “Rule To Show Cause Why A Judgment Decreeing Separation Of Property Should Not Be Granted.” On December 13, 2007, a judgment was signed “decreeing a Separation of Property and terminating the community of acquets and gains retroactively to the date of filing, September 4, 2007, pursuant to the provisions of [La. Civ.Code arts.] 2374 and 2375.”[2]
The matter proceeded to trial in family court on October 10, 2008, and concluded on November 14, 2008. The parties submitted testimony of various witnesses, including some expert witnesses, and introduced numerous documents into the record. At the close of the evidence, the matter was taken under advisement. On January 30, 2009, the court issued lengthy written reasons for judgment detailing its findings on each of the contested issues that had been argued at trial. A judgment in accordance with these findings was signed on March 3, 2009, wherein the property partition issues and other 14 cl aims contained in the detailed descriptive lists of the parties were decided. It is from this judgment that Mrs. *222 Trahan has appealed, assigning the following specifications of error:
A. The Trial Court erred in failing to grant Judgment for legal interest on the money Judgment in favor of [Mrs.] Tra-han against Mr. Trahan.
B. The Trial Court erred in failing to grant security for payment, and failing to provide for acceleration on default, of the Judgment payment owed by Mr. Trahan to [Mrs.] Trahan.
C. The Trial Court abused its discretion in its application of Expert Witness evidence in valuing Mr. Trahan’s interest in Chemtech Chemical Services, L.L.C.
D. The Trial Court abused its discretion in discounting its valuation of Mr. Trahan’s interest in Chemtech Chemical Services, LLC, by incorrectly applying a “marketability discount”.
E. The Trial Court erred in denying [Mrs.] Trahan’s claim for reimbursement for payment of Mr. Trahan’s separate mortgage debt with community funds.
F. The Trial Court erred in crediting Mr. Trahan with a Mercedes Benz debt payment unsupported by any evidence.
G. The Trial Court erred in requiring [Mrs.] Trahan to account for a purported $300.00 federal tax refund which never existed, and which is unsupported by any evidence.
H. The Trial Court erred in denying [Mrs.] Trahan’s [La. R.S.] 9:2801.1 claim for compensating value for Mr. Trahan’s Social Security benefits value accrued during the marriage in excess of Social Security benefits of [Mrs.] Trahan.
I. The Trial Court erred in failing to reduce Mr. Trahan’s reimbursement claim against [Mrs.] Trahan by one-half of the tax savings to Mr. Trahan resulting from his payment of community debt mortgage interest and property taxes included in that reimbursement claim.
J.The Trial Court erred in failing to render Judgment in favor of [Mrs.] Tra-han and against Mr. Trahan for all Expert Witness fees incurred by [Mrs.] Trahan in connection with the testimony of the following Expert Witnesses:
1. Ron Cartier, CPA;
2. Marc DeRouen, CVA;
3. Mark Shirley, CVA;
4. Dale Baringer, Board Certified Tax Attorney;
5. Michael B. Burris, CPA
ILLEGAL INTEREST
On appeal, Mrs. Trahan refers to the legal interest to which she alleges she is entitled as the “proverbial ‘800 pound gorilla in the room’ that simply cannot be ignored.” She acknowledges that nothing in the marriage contract between the parties entitles her to contractual interest. However, Mrs. Trahan argues she is clearly entitled to legal interest, an entirely different issue.
In response, Mr. Trahan argues that Mrs. Trahan’s claim that she is entitled to interest stems from the payments that she is owed by Mr. Trahan for Chemtech Chemical Services, LLC (“Chemtech”), and the home on S. Harrell’s Ferry Road, both items being the separate property of Mr. Trahan. Mr. Trahan further notes that these payments are owed as a result of the contract entered into by the parties prior to their marriage. Thus, Mr. Trahan maintains, these are not community property issues, but rather contractual obligations, making it necessary to look to the language of the contract to determine if the payment of interest was agreed upon by the parties to the contract. Mr. Trahan concludes that because the contract is void of any language regarding interest, and *223 because this is not community property being divided, Mrs. Trahan is not entitled to interest payments in this case. We disagree.
As support for her position that she is entitled to legal interest, Mrs. Trahan cites La.Code Civ. P. art. 1921, which provides as follows: “The court shall award interest in the judgment as prayed for or as provided by law.” According to the record, Mrs. Trahan filed her initial “Petition For Judicial Partition Of Property” on September 7, 2007. On January 7, 2008, she filed a “Detailed Descriptive List,” which was followed by a “Supplemental And Amending Detailed Descriptive List,” filed on July 22, 2008. On July 31, 2008, Mrs. Trahan filed a “Motion For Leave Of Court For Filing Of Supplemental And Amending Detailed Descriptive List Of Margaret Garrison Trahan; As Well As Filing Of Traversal By Margaret Garrison Trahan Of The Detailed Descriptive List Filed By Scott David Trahan.” In this final pleading, Mrs. Trahan specifically prays that “all monetary Judgments bear legal interest from date of judicial demand or date of partition as provided by law.” An order allowing Mrs. Trahan to file and serve this |6pleading was signed by the court on August 6, 2008. Thus, Mrs. Tra-han’s initial September 7, 2007 “Petition For Judicial Partition Of Property” was supplemented and amended as prayed for in the July 31, 2008 pleading, including but not limited to Mrs. Trahan’s request for legal interest. In an action for partition of community property, legal interest on an amount awarded to one of the spouses as a reimbursement, or as an equalizing payment, starts to run from the date of the judgment of partition. S. Litvinoff, Obligations, La. Civ. Law Treatise, § 9.7, p. 255 (1999); see also, Reinhardt v. Reinhardt, 99-0723, pp. 5-8 (La.10/19/99), 748 So.2d 423, 426-427; Manno v. Manno, 2001-2138, pp. 5-6 (La.App. 1 Cir. 10/2/02), 835 So.2d 649, 653; Michael v. Michael, 602 So.2d 1099, 1102 (La.App. 1 Cir.1992).
The marriage contract entered into by the parties in this case created a hybrid community property/separate property regime. Thus, although the family court was presented with various contractual claims to resolve, it was also asked to partition the legal regime of the community of ac-quets and gains that existed between the parties. Based on the unique facts and circumstances of this case, and the above cited jurisprudence and applicable law, it was error for the court not to include legal interest in its March 3, 2009 judgment. Accordingly, we amend said judgment to provide for legal interest on the money judgment in favor of Mrs. Trahan from the date of the judgment of partition.[3]
SECURITY FOR PAYMENT/ACCELERATION UPON DEFAULT
Mrs. Trahan argues the court erred in failing to provide for adequate security on the payments due her in the judgment and in failing to provide for acceleration upon default. While acknowledging that the marriage contract specifically states that the cash payment from Mr. Trahan to Mrs. Trahan concerning his interest in Chem-tech does not create a lien in favor of Mrs. Trahan or transfer any ownership interest in Chemtech to |7Mrs. Trahan, Mrs. Tra- *224 han cites the security provisions of La. R.S. 9:2801 and the second circuit case of Head v. Head, 30,585 (La.App. 2 Cir. 5/22/98), 714 So.2d 231, as support for her position on these issues. In response, Mr. Trahan alleges the absence of any provisions in the contract regarding security shows a clear intent of the parties not to require security. Mr. Trahan further states that the court has no authority to go beyond the four corners of the contract to impose such a burden.
Louisiana Revised Statutes 9:2801 sets forth the procedure to be followed by the parties in partitioning the community property and settling claims between them. In partícula!’, La. R.S. 9:2801(A)(4) directs the trial court as follows:
(4) The court shall then partition the community in accordance with the following rules:
(a) The court shall value the assets as of the time of trial on the merits, determine the liabilities, and adjudicate the claims of the parties.
(b) The court shall divide the community assets and liabilities so that each spouse receives property of an equal net value.
(c) The court shall allocate or assign to the respective spouses all of the community assets and liabilities. In allocating assets and liabilities, the court may divide a particular asset or liability equally or unequally or may allocate it in its entirety to one of the spouses. The court shall consider the nature and source of the asset or liability, the economic condition of each spouse, and any other circumstances that the court deems relevant. As between the spouses, the allocation of a liability to a spouse obligates that spouse to extinguish that liability. The allocation in no way affects the rights of creditors.
(d)In the event that the allocation of assets and liabilities results in an unequal net distribution, the court shall order the payment of an equalizing sum of money, either cash or deferred, secured or unsecured, upon such terms and conditions as the court shall direct. The court may order the execution of notes, mortgages, or other documents as it deems necessary, or may impose a mortgage or lien on either community or separate property, movable or immovable, as security. [Emphasis added.]
In statutory construction, the word “shall” is mandatory, and the word “may” is permissive. La. R.S. 1:3; La.Code Civ. P. art. 5053; Teano v. Electrical Const. Co., 2002-2032, pp. 12-13 (La.App. 1 Cir. 5/9/03), 849 So.2d 714, 724. Louisiana Revised Statutes 9:2801 does not mandate that the court provide for security in its judgment. This matter lies within the discretion of the court. Based on our review of the record | ^before us, we find no abuse of discretion by the court in its decision not to provide for security or for acceleration upon default. This assignment of error is without merit.[4]
*225 VALUE OF MR. TRAHAN’S INTEREST IN CHEMTECH
Mrs. Trahan argues that the court abused its discretion in its application of expert witness evidence in valuing Mr. Trahan’s interest in Chemteeh. She further alleges the court abused its discretion in discounting its valuation of Mr. Trahan’s interest in Chemteeh by incorrectly applying a marketability discount.
According to the record, Mr. Trahan is owner of 2/3 interest in Chemteeh. The other 1/3 interest is owned by Eric Mis-tretta. The marriage contract executed by the parties in December 1998 provided as follows with regard to Chemteeh:
[Mrs. Trahan] specifically waives and relinquishes all of the rights which she may have to [Mr. Trahan’s] ownership interest in [Chemteeh] for the first five years of marriage between the parties. If the parties divorce after five years of marriage, [Mrs. Trahan] will continue to specifically waive and relinquish all of the rights which she may have to [Mr. Trahan’s] ownership interest in [Chem-tech]; however, she shall be entitled to a cash payment from [Mr. Trahan] equal to the value of one-half of [Mr. Trahan’s] interest in Chemteeh as of the date of the judgment of divorce. A $1,500,000.00 credit will be assessed to Chemtech’s appraised value to calculate [Mr. Trahan’s] interest. The value of Chemteeh, and in turn, [Mr. Trahan’s] interest therein, shall be arrived at by taking the average appraised value of two independent appraisers using an agreed upon method of appraisal by the parties. [Mr. Trahan] and [Mrs. Tra-han] will agree to a payout term of not less than four (4) years and other terms of the payout if necessary. This right to a cash payment as outlined above does not in any way create a lien in favor of [Mrs. Trahan], or transfer any ownership interest in Chemteeh to [Mrs. Tra-han].
LOn February 4, 2008, Mr. Trahan filed a motion to have the court appoint an independent appraiser for the valuation of Chemteeh in accordance with the marriage contract. This led to a “Stipulated Judgment” signed by the court on March 11, 2008, whereby the court appointed Ronald D. Cartier to appraise Chemteeh. The judgment further provided that the parties would not be precluded from having their own appraisers appointed to perform independent appraisals of Chemteeh. Thus, the following experts testified regarding the appraisal value of Chemteeh — Ronald D. Cartier, the court appointed expert; James Koerber, expert for Mr. Trahan; and Mare DeRouen, expert for Mrs. Tra-han.[5]
After hearing much testimony and considering many documents regarding the *226 daily operations of Chemtech, the court provided the following detailed reasons for its decision to adopt Mr. Koerber’s appraisal of $8,177,530.00 in its valuation of Chemtech:
Three appraisers testified regarding the value of Chemtech. Mr. Trahan’s appraiser, Mr. James Koerber and [Mrs.] Trahan’s appraiser Mr. [Marc] DeRouen both used the same method in valuing Chemtech, the discounted net cash flows method. Mr. DeRouen assigned a value to Chemtech of $14,800,000_Mr. Koerber assigned a value to Chemtech of $8,177,530.... As explained by Mr. Koerber, this method is prospective where an appraiser projects future earnings and then discounts them to present value. Mr. DeRouen explained this method as one that focuses on anticipation of future cash flow to the owners of the business.
Mr. Cartier, who was appointed by the court, used a different method of appraisal, an EBIDA [Earnings Before Interest, Depreciation, and Amortization] valuation, and assigned a value of $13,250,000 for Chemtech. Mr. DeR-ouen testified that EBIDA tends to produce a higher number than the discounted cash flows method. Both Mr. DeRouen and Mr. Koerber agreed that Mr. Cartier did not follow the valuation standards for business appraisals. They both gave various reasons why the method used by Mr. Cartier was inappropriate in valuing this small closely held business. Mr. Carder’s approach differed from the other appraisers and he is not a certified business appraiser therefore, the court did not ... use his appraisal.
Mr. DeRouen and Mr. Koerber, both certified business appraisers, had similar capitalization rates and many of their numbers were the same. In fact, Mr. Koerber testified that his report was completed weeks before Mr. DeRouen’s report and that Mr. DeRouen used his calculations with a couple of modifications. Mr. DeRouen also testified that he used Mr. |inKoerber’s information and then departed from it in the gross profit margin and the operating expenses.
Mr. DeRouen used a gross profit percentage of 50.67% for the years 2009 through 2012. He testified that he arrived at the 50.67% figure using the average gross profit from the years 2004-2007. He further testified that, out of an abundance of caution, he agreed with Mr. Koerber for the year 2008 and used a gross profit percentage of 46.5% for that year. He explained that he did this because his conversations with the management of Chemtech indicated that there may be some problem reaching the average gross profit figure. He stated that he looked online at the cost issues and although he saw that the cost of materials was in an up cycle, he did not see where Chemtech was having difficulty passing on price increases and therefore saw no effect of the raw materials cost increase on the profits of Chemtech. When Mr. DeR-ouen was questioned about an article stating that it will get more difficult for chemical companies to pass on price increases, Mr. DeRouen responded that the question was whether that was known or knowable in January 2008, seeming to imply that it was not. On cross examination Mr. DeRouen admitted that he did not know which raw material prices have increased the most. He stated that the management of Chemtech did not mention to him that they had stockpiled materials so they would not have felt the effect of the price increases at the time of the valuation.
*227 Mr. Koerber used a gross profit percentage of 46.50% for the future. He testified that he based his figure on the history of the company and the conferences that he had with Mr. Trahan and Mr. Mistretta, who showed him what they are spending on raw materials. He cited Chemtech’s blend sheets and the recent rise in the cost of raw materials as the reason for his lower gross profit percentage. He testified that he looked at prices of raw materials prior to the valuation date and that these things were “known and knowable”. Mr. Koer-ber was able to testify about specific price increases for chemicals used by Chemtech. Mr. Koerber testified that he does work for a phosphates plant and that they have seen similar price increases. Mr. Koerber testified that it does not appear that Mr. DeRouen looked at the cost of raw materials or the blend sheets. He testified that as of the valuation date there was a tremendous increase in prices, only some of which can be passed on to the customer. He also discussed two anomalies that happened in 2007 that lead [sic] to greater gross profits for that year. These were a sale of equipment and large Mo-tiva contracts that Chemtech received with no bid.
Operating expenses were the other major distinction in the appraisers’ values. Mr. DeRouen testified that he determined that Chemtech’s operating expenses are high in comparison with their industry peers and have been high historically. He stated that he felt there is room for efficiency there. When questioned on cross about how he picked the percentage of future operating expenses that he used in his report, he stated that he just used a judgment call.
Mr. Koerber found that the operating expenses would grow at the same rate as sales. He stated that he used Chem-tech’s business model as well as their past as evidence for this and that his projections are based on historical information. He testified that Mr. DeRouen did not use the historical numbers.
|nMr. Mistretta, Mr. Trahan’s partner, and Mr. Trahan testified about how Chemtech is operated. Mr. Mistretta discussed two large new contracts with Motiva in 2006 and 2007. He stated that they received Shell Motiva without bid and they were able to charge a very high price for the work. He stated that this no bid contract, high price, and lag time between receiving the payment and incurring the cost lead them to a bubble in net profit for 2007. He said that Mr. DeRouen did not take this into account in his valuation. He further testified that Chemtech has never averaged the projected profits in Mr. DeRouen’s report. Mr. Mistretta testified that one of the Motiva contracts is up for bid in September 2009 and that they were told that they have to get their price down because Motiva is no longer in a “hurry up and fix the problem” situation. He said that Chemtech must lower its price to be more competitive because it was 70% higher than prior vendors. He said that this price reduction will come directly off the profit that Chemtech made in the past with Motiva. Mr. Mistretta also testified about his concern that the key people who initially gave Chemtech the accounts are no longer at the plants. Shell differs from their other customers in this regard since they rotate their employees to other plants every few years. These Motiva contracts represent almost 50% of Chemtech’s business. Much testimony was given about the sale of a large piece of equipment in 2007 that also lead [sic] to a greater profit margin.
*228 Mr. Mistretta also testified about the cost of raw materials. He testified that raw material costs are not cyclical as alleged by Mr. DeRouen and that costs have increased 100 to 200% in the last year. Chemtech’s competitors have better gross profit margins because they are much larger and they are able to buy in bulk. Chemtech is the smallest among its competitors. Mr. Trahan testified that Chemtech has contracts with some of its customers that prohibit passing on cost increases.
Mr. Koerber argued during trial that after understanding what Mr. Trahan intended in the marriage contract he would have used the asset based approach. He did give a value for Chem-tech using this method. The contract says only that the parties will determine the value of Chemtech using an agreed upon method. The Court believes that this value must be the fair market value. The discounted cash flow method is the method used by both appraisers and for which the Court had the most testimony and information. The Court has determined that it is an appropriate method and will use the numbers from that method to value Chemtech Chemical Services L.L.C.
After an exhaustive consideration of the reports and testimony presented to the Court regarding the value of Chem-tech, the Court finds Mr. Koerber’s value using the discounted cash flow method is the appropriate value of Chemtech. He clearly had the most knowledge of the everyday workings of Chemtech as well as their contracts and history. Additionally, Mr. Koerber’s numbers were all similar regardless of the method he used while Mr. DeRouen had a much lower number using the capitalized cash flow method. Mr. Koerber testified that the numbers using the discounted cash flow method and the capitalized cash flow method should be close and if they are not, the valuator should know that something is wrong. Interestingly Mr. DeRouen’s value using the capitalized cash flow method was about the same as Mr. Koerber’s, yet by simply changing the percentage of gross profit and operating expenses he arrive[d] at a much greater value with the discounted cash flow method. Mr. Ralph Stevens, who was admitted as an expert in tax law and 112business valuations, also testified that all of the numbers should have been similar whether using the discounted cash flow method or the capitalized cash flow method. Mr. DeRouen stated that he used many of Mr. Koerber’s numbers and changed operating expenses because he felt there was more room for efficiency as compared with similar companies. There was no evidence introduced that Chemtech will suddenly become more efficient in the future.
Mr. Mistretta’s testimony was clear, direct and extremely helpful in outlining how Chemtech is operated and why the profits were greater in certain years. Mr. Koerber was more aware of the activities described by Mr. Mistretta. Mr. Koerber’s numbers were more clearly supported by historical evidence.
It is well settled in Louisiana that the trier of fact is not bound by the testimony of an expert, but such testimony is to be weighed the same as any other evidence. The trier of fact may accept or reject in whole or in part the opinion expressed by an expert. Harris v. State ex rel. Dept. of Transp. and Development, 2007-1566, p. 25 (La.App. 1 Cir. 11/10/08), 997 So.2d 849, 866, writ denied, 2008-2886 (La.2/6/09), 999 So.2d 785. The effect and weight to be given expert testimony is within the broad discretion of the trial court. Morgan v. State Farm Fire and Cas. Co., Inc., 2007-0334, p. 8 (La. *229 App.11/2/07), 978 So.2d 941, 946. The decision reached by the trial court regarding expert testimony mil not be disturbed on appeal absent a finding that the trial court abused its discretion. Louisiana State Bar Ass’n v. Carr and Associates, Inc., 2008-2114, p. 17 (La.App. 1 Cir. 5/8/09), 15 So.3d 158, 171, writ denied, 2009-1627 (La.10/30/09), 21 So.3d 292.
Having thoroughly reviewed the evidence and expert testimony, we find no abuse of the trial court’s discretion in finding Mr. Koerber’s appraisal value of Chemtech, which he arrived at using the discounted cash flow method, to be the appropriate appraisal value of Chemtech based on the facts and circumstances of this case. Thus, Mrs. Trahan’s assignment of error regarding the court’s alleged abuse of discretion in its application of expert witness evidence in valuing Mr. Trahan’s interest in Chemtech is without merit. However, our analysis of Mr. Tra-han’s interest in Chemtech does not end here.
After concluding that Mr. Koerber’s appraisal value was an appropriate starting point, the court then applied a marketability discount in determining the fair market | [3value of Chemtech. With regard to whether the marketability discount should be applied in this case, the court made the following findings in its written reasons for judgment:
Mr. DeRouen and Mr. Koerber both provided the value of Chemtech before and after the marketability discount. Mr. DeRouen explained that a marketability discount is applied in valuing a small closely held business because you are not valuing something that can be readily traded and this applies to Chem-tech. He testified that there is a discount due to the fact that it is not traded on the free and open market. It has restricted stock. Also studies tell us that in companies of this sort the time to sell is an important factor. Mr. DeR-ouen suggested, however, that it may not be necessary to use a marketability discount, as there is no plan to sell the business, however he stated he felt that was within the discretion of the court.
Mr. Koerber testified that he thought it was necessary to include a marketability discount because Chemtech is a closely held entity. The Court is aware of the jurisprudence from the 5th, 4th, and 2nd circuits applying no marketability discount to businesses where there were no plans to sell them, and the 3rd circuit case where a marketability discount was applied. D’Spain v. D’Spain, 527 So.2d 309 (La.Ct.App. 5th Cir.1988), writ granted, cause remanded, 528 So.2d 152 (La.1988) and Mexic v. Mexic, 577 So.2d 1046 (La.Ct.App. 4th Cir.1991)), are factually distinguishable from this case and both involved the valuing of real estate. See Collier v. Collier, 790 So.2d 759 (La.Ct.App.3d Cir.2001), writ denied, 803 So.2d 30 (La.2001), where a marketability discount was applied and [Head v. Head, 714 So.2d 231 (La.Ct. App. 2nd Cir.1998) ] where a marketability discount was not applied.
Louisiana courts have not clearly determined a standard for valuing a community business. The contract in this case provides only that [Mrs.] Trahan shall be entitled to 1/2 the value of Chemtech Chemical Services. The Court believes the marketability/majority discount is appropriate because Chemtech is a small, closely-held L.L.C[.] with only two members. Mr. Trahan is the majority owner, however he and Mr. Mistretta clearly work together making decisions for the company. Therefore, a 20% marketability discount is appropriate considering all the facts in this case and was applied by the *230 Court. The fact that this company is small, closely held and not traded on the open market limits the available buyers and thereby reduces the price. The marketability discount is, appropriate in this case.
[[Image here]]
Mr. Koerber, using the discounted cash flow method, valued Chemtech at $8,177,530. The Court determined that a marketability discount was appropriate. Therefore, after the 20% marketability discount, he found the fair market value of Chemtech to be $6,542,024. As per the contract the $1,500,000.00 will be subtracted from the entire value of Chemtech. This total equals $5,042,024. Mr. Trahan’s 66.67% interest in this amount is $3,361,517.40. Therefore, [Mrs.] Trahan is entitled to 1/2 of that amount or $1,680,758.70.
114Mrs. Trahan argues on appeal that the court’s decision to apply a marketability discount to the value of Chemtech is clearly contrary to the Louisiana Supreme Court’s ruling in Cannon v. Bertrand, 2008-1073 (La. 1/21/09), 2 So.3d 393. In Cannon, one of three members of a limited liability corporation, Cannon, notified the other two that he desired to withdraw, and subsequently filed suit to have the value of his one-third share determined. The plaintiffs expert suggested no minority discount; defendants’ expert suggested 75 percent; the trial court applied 35 percent, which the court of appeal affirmed. On writs to the Louisiana Supreme Court, it held that no discount should have been applied, noting as follows:
Minority discounts and other discounts, such as for lack of marketability, may have a place in our law; however, such discounts must be used sparingly and only when the facts support their use. Here, the district court determined the value of the assets owned by the company and then applied a discount. Under the particular facts of this case, though, the use of a discount was unwarranted and, therefore, the district court abused its discretion in applying such a discount. The buyers of the partnership interest at issue are the two remaining partners in the partnership. These two partners will not be subject to a lack of control as would a third party, as each has an equal say in the control of the partnership, and, because the partners have already determined to purchase the partnership share themselves by opting to continue the partnership and avoid liquidation, neither is lack of marketability an issue. Furthermore, discounting the market value of the partnership’s property would be inequitable. The withdrawing partner should not be penalized for doing something the law allows him to do, and the remaining partners should not thereby realize a windfall profit at his expense. [Footnotes omitted.]
Cannon, 2008-1073 at 5-6, 2 So.3d at 396-397. The Cannon court did not state that marketability discounts should never be used, but rather stated that the discounts should be used “sparingly and only when the facts support their use.” Cannon, 2008-1073 at 5, 2 So.3d at 396. Based on the facts particular to that case, the court concluded that a discount was not warranted.
In the instant case, unlike in Cannon, the marketability discount was applied by experts for both parties and accepted by the court based on the facts and circumstances herein. In Cannon, the sole issue before the court was the value of the business. That was not the case here as can be seen from the lengthy list of issues presented for our review. This case involved the classification and valuation of numerous assets and liabilities. The court *231 below noted that Chemtech was a small, | lscIosely-held company and that although Mr. Trahan was the majority owner, he and Mr. Mistretta worked closely together to make decisions for the company. Thus, the court concluded that a marketability discount was appropriate. Based on our review of the record herein and the facts and circumstances particular to this case, we find the court was not in error in applying the marketability discount.
MRS. TRAHAN’S CLAIM FOR SEPARATE MORTGAGE DEBT PAYMENT
Mrs. Trahan asserts the court erred in denying her claim for reimbursement for payment of Mr. Trahan’s separate mortgage debt with community funds. Mrs. Trahan alleges that Mr. Trahan’s separate mortgage debt on his home had a $150,000.00 principal balance at the time of their marriage, all of which was paid off during their marriage with community funds, thus entitling Mrs. Trahan to a $75,000.00 reimbursement payment by Mr. Trahan. In response, Mr. Trahan argues that “the family home basically became community (in the form of joint ownership) when Mr. Trahan donated one-half of the home to [Mrs.] Trahan, keeping a credit for the equity that he had in the home prior to the marriage.” Thus, Mr. Trahan maintains, “the community funds used to pay the note from the time that they were married were used to pay a community debt since the house was now owned by both of the parties.”
After considering the evidence and hearing from the parties on the issue of Mrs. Trahan’s claim for reimbursement for payment of Mr. Trahan’s separate mortgage debt with community funds with regard to the S. Harrell’s Ferry Road home, the court made the following findings:
[Mrs.] Trahan claimed she is entitled to reimbursement for the separate mortgage debt on the South Harrell’s Ferry Road home brought into the marriage by Mr. Trahan and paid with community funds. Clearly, had there been no marriage contract specifically dealing with what [Mrs.] Trahan was entitled to out of the South Harrell’s Ferry home, she would be entitled to one-half (not 100% as argue[d] by [Mrs.] Trahan in her post trial brief) of the community funds paid [sic] used to pay this debt. However, the marriage contract entered into between the parties specifically addresses the sum that [Mrs.] Trahan is entitled to from the South Harrell’s Ferry Road home. The contract provides, “[Mrs. Trahan] shall also be entitled to one-half of the increased equity in the property after the date of marriage.” Equity is the value of a piece of property over and above any mortgage or other liabilities relating to it. Mr. Trahan had a mortgage of approximately $150,000.00 on the home at the time of the 11f,marriage. $210,000.00 was the value of the home over and above this $150,000.00 mortgage, at the time of the marriage. As the mortgage was paid, it increased the equity in which [Mrs.] Trahan shared.
Had the parties wanted [Mrs.] Trahan to be entitled to additional sums for payment of the mortgage during the marriage they necessarily would have had to include this in the contract. This would have led to an absurd result. Using [Mrs.] Trahan’s argument each time the community paid $1 on the mortgage she was entitled to 50 cents in reimbursement and 50 cents in increased equity in the home, thereby giving Mr. Trahan absolutely no benefit from any of the payments on this mortgage. The fact that the parties placed additional mortgages on the home is not relevant to this issue.
*232 [Mrs.] Trahan’s claim for one-half of the principal paid on the mortgage on the South Harrell’s Ferry Road home is denied.
The marriage contract specifically provides for Mrs. Trahan’s interest in the home as follows:
[Mrs. Trahan] specifically waives and [relinquishes] of all of rights which she may have to any and all equity accumulated by [Mr. Trahan] in this separate property prior to their marriage. The parties agree that [Mr. Trahan’s] equity is $210,000.00 at the time of the execution of this agreement. [Mrs. Trahan] shall be entitled to reimbursement of any and all of her separate funds used to make improvements to the above-mentioned property, and any appreciation in the property attributed to the investment of her separate funds into the property in the event of a divorce between the parties. [Mrs. Trahan] shall also be entitled to one-half of the increased equity in the property after the date of marriage. This separate property will remain under the sole civil administration or control of [Mr. Trahan]. If the property is rented or leased and the parties are still married, the income and/or rents from the property will be divided equally between the community and [Mr. Trahan] as his separate property, after deductions are made for expenses.
The language of the contract is clear. A contract between the parties is the law between them, and the courts are obligated to give legal effect to such contracts according to the true intent of the parties. La. Civ. Code art. 2045; Amoco Production Co. v. Fina Oil & Chemical Co., 95-1185, p. 11 (La.App. 1 Cir. 2/23/96), 670 So.2d 502, 511, writ denied, 96-1024 (La.5/31/96), 673 So.2d 1037. As correctly noted by the court below, had there been no provision in the marriage contract specifically dealing with this issue, the outcome would be different. However, we have thoroughly reviewed the record and the evidence and conclude that given the facts and circumstances as presented herein, the court did not err in denying Mrs. Trahan’s claim for reimbursement of one-half of |17the principal paid on the pre-marriage separate mortgage debt on the S. Harrell’s Ferry Road home. This assignment of error is without merit.
THE MERCEDES BENZ DEBT CREDITED TO MR.
TRAHAN
Mrs. Trahan alleges the court erred in crediting Mr. Trahan with a credit for the $38,288.02 debt on the Mercedes Benz as there was no trial evidence to support the existence of this debt. Mr. Trahan responds that this was a community vehicle that was used by him, while Mrs. Trahan drove a leased BMW. Mr. Trahan also points out that at the time of trial, the balance owed on the Mercedes Benz was $38,288.02 as agreed upon by the parties.
According to the record, the parties stipulated that the value of the Mercedes Benz was $43,287.00. The only evidence in the record of the $38,288.02 debt is “Exhibit A” attached to Mr. Trahan’s post-trial brief.[6] This exhibit is a statement from Chase Auto Finance showing a principal balance as of November 14, 2008, of *233 $38,288.02. The statement also shows a monthly payment of $1,186.83, which is the same amount Mr. Trahan attributed to his monthly car payment when asked at trial about his monthly expenses. Based on our review of the record, we find the court’s ruling on this issue to be clearly supported by the evidence in the record. Mrs. Tra-han’s to the contrary is without merit.
$300.00 FEDERAL TAX REFUND
Mrs. Trahan claims a $300.00 federal tax refund that was allocated to her must be removed from the accounting as there was no evidence that she received this refund. She also alleges that this refund is not listed in the Joint Detailed Descriptive List of the parties or any separated Detailed Descriptive List of Mr. Trahan. We find no merit to this argument.
[ |RAccor ding to the record, this $300.00 refund was listed by Mr. Trahan in both of the Detailed Descriptive Lists that he filed, the January 10, 2008 filing and the July 23, 2008 filing. The refund was also included in the Joint Detailed Descriptive List filed on August 22, 2008. In written reasons for judgment, the court found, “The parties received a federal tax refund in the amount of $300.00 which is in the possession of [Mrs.] Trahan. This asset shall be allocated to [Mrs.] Trahan.” Based on the record before us, we cannot say the court erred in this respect.
MRS. TRAHAN’S SOCIAL SECURITY CLAIM
Mrs. Trahan argues on appeal that the court erred in denying her claim for compensating property allocation, in accordance with La. R.S. 9:2801.1, to offset Mr. Trahan’s excess social security interest accumulated during the marriage. Mr. Trahan asserts the court correctly denied the claim “for many reasons,” chief among them that Mrs. Trahan has no right to receive social security benefits from Mr. Trahan. While we acknowledge a trial court’s discretion under La. R.S. 9:2801.1 to assign a spouse community property equal to the amount the other spouse will receive in social security benefits, we find no merit to Mrs. Trahan’s argument based on the unique facts of this case.
In denying Mrs. Trahan’s claim, the court gave the following reasons:
[Mrs.] Trahan asserts a claim in accordance with [La.] R.S. 9:2801.1 against the social security retirement account of [Mr.] Trahan funded during the marriage in excess of the Social Security Retirement Account value of [Mrs.] Tra-han. She asserts a claim in the amount of $14,033.58.
[La.] R.S. [9:2801.1] states
“When federal law or the provisions of a statutory pension or retirement plan, state or federal, preempt or preclude community classification of property that would have been classified as community property under the principles of the Civil Code, the spouse of the person entitled to such property shall be allocated or assigned the ownership of community property equal in value to such property prior to the division of the rest of the community property. Nevertheless, if such property consists of a spouse’s right to receive social security benefits or the benefits themselves, then the court in its discretion may allocate or assign other community property, equal in value to the other spouse.”
I,¡¡Mr. Burris, [Mrs.] Trahan’s expert CPA provided the Court with his method of determining the amount [Mrs.] Trahan was owed. Mr. Burris testified that he used his own social security information because he and Mr. Trahan are the same age and have a similar work history. Mr. Burris stated that “if his assumption were correct” [then] his *234 calculation would be very close. Further, 42 U.S.C.A. entitles a “divorced” wife to social security of their husband only if they were married for a period of ten years. These parties clearly were not. 9:2801 leaves this within the [courts’] discretion. The evidence introduced was insufficient to support this claim. There were far too many speculations, assumptions and unknowns in the calculation provided to the Court. Further, these parties entered into a marriage contract that resulted in [Mrs.] Trahan receiving significant assets that she would not have received without the marriage contract. Presumably had the parties wanted to include additional amounts for social security they would have done so in the contract. Therefore, the Court will not allocate additional community property to [Mrs.] Trahan.
We find no abuse of discretion by the court in denying this claim. This assignment of error is without merit.
REDUCTION OF MR. TRAHAN’S REIMBURSEMENT CLAIM
Mrs. Trahan alleges that she is owed additional funds because the court failed to reduce Mr. Trahan’s reimbursement claim by one-half of the alleged tax savings to Mr. Trahan. Mr. Trahan asserts the court properly denied this claim because Mrs. Trahan presented no evidence at trial of what, if any, benefit Mr. Trahan would receive from those deductions.
After reviewing the evidence and hearing testimony from the parties and expert witnesses, the court denied Mrs. Trahan’s claim. The court gave the following reasons for its findings:
[Mrs.] Trahan requests that, to the extent Mr. Trahan asserts a claim for reimbursement of any tax deductible community items paid with separate funds, she be given an offset against the reimbursement claim for one-half of the tax savings to Mr. Trahan. [Mrs.] Tra-han presented no evidence at trial of what, if any, benefit Mr. Trahan would receive for these deductions. In fact, in the year 2007 [Mrs.] Trahan prevented Mr. Trahan from claiming itemized deductions by rushing to file her return so that she could receive a $33,000 refund and leaving him with several hundred thousand dollars in debt to pay. [Mrs.] Trahan now alleges that her CPA is working with Mr. Trahan’s CPA to file an amended 2007 return with itemized deductions. There was no evidence of this at trial. There was some testimony at trial indicating that, due to the high tax bracket of Mr. Trahan, he will not be able to take advantage of these deductions. Insufficient evidence was introduced to support this claim.
The evidence in the record reasonably supports the court’s ruling on this issue. Therefore, we find no error by the court. This assignment of error is meritless.
UEXPBRT WITNESS FEES
With regard to expert witness fees, the court stated as follows in its written reasons for judgment: “The fees of Mr. Cartier shall be taxed as costs and shall be split equally between the parties. Each party shall be responsible for their own expert witness fees for the remainder of the expert witnesses.” Mrs. Trahan argues that judgment should be rendered in favor of Mrs. Trahan and against Mr. Trahan for the entirety of all expert fees incurred by Mrs. Trahan. On appeal, the amount and fixing of expert fees will not be disturbed in the absence of an abuse of discretion. Samuel v. Baton Rouge Gen. Med. Center, 99-1148, p. 8 (LaApp. 1 Cir. 10/2/00), 798 So.2d 126, 132. We find no abuse of discretion in the court’s ruling on *235 expert witness fees and decline to disturb same.
CONCLUSION
For the above and foregoing reasons, we amend the March 3, 2009 judgment to provide for legal interest in favor of Mrs. Trahan from the date of the judgment of partition. In all other respects, the judgment is affirmed. All costs associated with this appeal are assessed equally between the parties.
AMENDED IN PART, AND AS AMENDED, AFFIRMED.

. On May 24, 2010, a "Motion To Substitute Party Plaintiff/Appellant (In Property Partition Proceeding)” was filed informing this court that Margaret Garrison Trahan died on May 19, 2010, from a long term illness and that James G. Garrison, former husband of Margaret Garrison Trahan, had been appointed Independent Executor of the Succession of Margaret Garrison Trahan and desired to be substituted as party plaintiff/appellant in this proceeding. An order was signed by this court granting said request on May 26, 2010. However, to avoid confusion, we will refer to the parties in this matter as Mr. and Mrs. Trahan.

. Louisiana Civil Code article 2374 provides, in pertinent part, as follows:
A. When the interest of a spouse in a community property regime is threatened to be diminished by the fraud, fault, neglect, or incompetence of the other spouse, or by the disorder of the affairs of the other spouse, he may obtain a judgment decreeing separation of property.
[[Image here]]
C. When a petition for divorce has been filed, either spouse may obtain a judgment decreeing separation of property, by a rule to show cause and upon proof that the spouses have lived separate and apart without reconciliation for at least thirty days from the date of, or prior to, the filing of the petition for divorce and have not reconciled.
Louisiana Civil Code article 2375 provides, in pertinent part, as follows:
A. Except as provided in Paragraph C of this Article, a judgment decreeing separation of property terminates the regime of community property retroactively to the day of the filing of the petition or motion therefor, without prejudice to rights validly acquired in the interim between filing of the petition or motion and rendition of judgment.
[[Image here]]
C. If a judgment is rendered on the ground that the spouses were living separate and apart after the filing of a petition for divorce without having reconciled, the judgment shall be effective retroactively to the date the original petition for divorce was filed, without prejudice to rights validly acquired in the interim between filing of the petition or motion and rendition of judgment. All subsequent pleadings or motions involving matters incidental to the divorce must be filed in the first filed suit.

. In brief, Mr. Trahan argues that even if Mrs. Trahan is entitled to legal interest, she would not be entitled to any interest until at least the expiration of four years because the marriage contract provided for a payout term of not less than four years. Mr. Trahan cites no authorily for his position, and we can find none. As previously indicated, legal interest in a case such as this runs from the date of the judgment of partition. See Reinhardt, 99-0723 at 5-8, 748 So.2d at 426-427.

. The Head case cited by Mrs. Trahan is easily distinguished from the case before us now. In Head, the parties to a community property dispute asked the trial court to value the community stock in a family corporation. The trial court calculated an equalizing payment owed by Mr. Head to Mrs. Head of $114,181.23, directing this amount to be paid to Mrs. Head in 120 monthly installments at eight percent interest. Head, 30,585 at 16, 714 So.2d at 240. On appeal, the second circuit noted Mr. Head had not requested that the trial court defer payment. "We are unable to discern from the record a reason for the trial court's unsolicited deferral of an unsecured equalizing payment, particularly without imposing terms and conditions for the deferral as [La. R.S. 9:2801] directs." Head, *225 30,585 at 17, 714 So.2d at 240 (emphasis in original). The second circuit ultimately concluded that the trial court abused its discretion by deferring the equalizing payment without providing for either or both acceleration of the debt upon default and security of adequate value to satisfy the amount of the equalizing payment. Head, 30,585 at 18, 714 So.2d at 240-241. In the instant case, there is no “unsolicited deferral of an unsecured equalizing payment.'' Here, the parties entered into a marriage contract and agreed to “a payout term of not less than four (4) years and other terms of the payout if necessary.” The contract further provided that the right to a cash payment by Mr. Trahan to Mrs. Trahan did "not in any way create a lien in favor of [Mrs. Trahan],” thus evidencing the parties’ intent that there would be no security for any payment that might be awarded.

. Also testifying briefly on behalf of Mrs. Tra-han was Mark Shirley, a certified valuation analyst. Mr. Shirley was Mr. DeRouen's partner who worked along with Mr. DeRouen in the appraisal of Chemteeh. Mr. Shirley was the co-author of Mr. DeRouen's report on Chemteeh.

. At the close of evidence, the court instructed the parties to file post-trial briefs. There was some discussion on the record about what the court expected from these briefs. However, there was also mention of discussions "in chambers," thus making it impossible for us to know exactly what the court advised the parties regarding the admissibility of additional exhibits. Nonetheless, it is clear that the court considered Mr. Trahan's exhibit in ruling on this issue. Thus, it is also before us on review.